**In re: ADOPTION of S.M., A Minor.**

**Appeal of: D.S., Natural Father.**

Superior Court of Pennsylvania.

Submitted Jan. 6, 2003.

Filed Jan. 27, 2003.

Raymond N. Sanchas, Pittsburgh, for appellant.

Scott M. Hollander, Pittsburgh, for S.M., appellee.

Nicole D. Manison, Pittsburgh, for Children and Youth Services of Allegheny County, appellee.

Before: GRACI, CAVANAUGH, JJ. and McEWEN, P.J.E.

CAVANAUGH, J.

¶ 1 D.S. (father) appeals from the order which involuntarily terminated his parental rights to S.M. (daughter; d.o.b. March 17, 1995).[1] We reverse.

¶ 2 D.S. is the natural father of S.M. The infant tested positive for cocaine on the day she was born and she was adjudicated a dependent child on April 26, 1995.[2] That date, S.M. was placed in the care of her maternal grandmother where father periodically assisted by baby-sitting the child. Father subsequently served an eight-month sentence of incarceration for convic-tion of marijuana charges. His release from prison was on January 31, 1997.

¶ 3 Thereafter, Allegheny County Children Youth and Family Services (CYF) developed a plan which, among other things, required father to complete an inpatient drug treatment program. Father did so and S.M. was removed from maternal grandmother's care and placed into father's care on July 17, 1998.

¶ 4 Father developed a relationship with a paramour, M.F. Father, his paramour and S.M. began living together as a family and subsequently father and M.F. had a child (S.M.'s younger half-brother). S.M., now seven years of age, views her family as consisting of father, M.F., and her half-brother.

¶ 5 In October 1999, when S.M. was four years old, father relapsed into drug abuse (cocaine) and voluntarily entered an inpatient treatment program. He was discharged after three weeks into an intensive outpatient program. CYF was informed and amended its family services plan to require father's compliance with weekly urine tests for drugs. Father was only partially compliant. He submitted less than the required number of samples (all negative) and did not regularly attend the outpatient program because it interfered with his work schedule (construction laborer). During this period, S.M. continued to live with father and M.F. and her half-brother with CYF's knowledge and consent.

¶ 6 In March of 2000, father provided a urine sample which was positive for cocaine. At that time, S.M. was formally removed from father's care and placed

---

1. We have corrected the caption by substitution of initials in the place of proper names.

2. Natural mother was apparently addicted to cocaine throughout the pregnancy and essentially abdicated all parental responsibility for S.M. shortly after giving birth. Natural mother's parental rights were involuntarily terminated by the same order which terminated father's rights. There are no issues before us regarding that determination.

with that of his paramour, M.F.; however, it is apparent that despite the "removal," father continued to regularly reside with M.F. and the children as a family unit. Following the March, 2000, positive drug test, father stopped giving urine samples and stopped going to outpatient drug rehab. On September 21, 2001, CYF filed a petition for involuntary termination of father's and natural mother's parental rights. In November of 2001, father became intoxicated with alcohol and insisted on driving the family vehicle. M.F. would not surrender the keys to him and the argument apparently escalated to the point where police were called. Father was reportedly arrested and spent two days in jail. After his release, father submitted five negative urine samples.

¶ 7 A hearing on the petition was conducted on May 3, 2002. At the hearing, testimony was received by expert witness, Dr. Neil Rosenblum, who conducted separate interactional evaluations of father, step-mother and S.M. in January of 2002. The court summarized Dr. Rosenblum's testimony via the following findings of fact:

25. Dr. Rosenblum made the following observations, assessments and recommendations based upon the evaluations.

a) The foster mother, [M.F.], is father's paramour. She has a son by [him].

b) Foster mother is [S.M.'s] psychological mother.

c) Although [S.M.] knows on some level that she has a birth mother, the child cannot remember the last time she saw birth mother and cannot remember what birth mother looks like.

d) Foster mother is an excellent parent. She takes excellent physical care of [S.M.] and [S.M.] is secure with her.

e) [Deleted by the court].

f) Foster mother is warm and nurturing and gives appropriate praise.

g) Foster mother makes no distinction between [S.M.] and her own biological child.

h) Foster mother allows father to be an integral part of [S.M.'s] life. They are very much a family. Dr. Rosenblum believes that foster mother will continue [to] promote the relationship with [S.M.] and her father no matter what the outcome of the hearing may be.

i) In defining her family, [S.M.] included foster mother, father, her half-brother and herself.

j) [S.M.] was equally relaxed and comfortable with her father.

k) Father was patient with [S.M.] and showed positive interest in the child.

l) Father has a significant and relevant role in [S.M.'s] life.

m) Father tends to minimize his issues and the issues which led to the removal of the child.

n) Father had ongoing addiction and domestic violence issues.

o) [S.M.] is thriving in her current family life.

p) Foster mother is the 'backbone' of the family and the more responsible parent.

q) [S.M.'s] love and affection for foster mother and her father is quite apparent, as is their love for her.

r) No contact with the father would be harmful to the child.

s) No contact with foster mother would be harmful to the child[.]

t) No contact with foster mother would be more harmful than no contact with father.

u) Dr. Rosenblum does not believe that [S.M.] could safely be placed

[solely] into father's care at this time. [Dr. Rosenblum] has more confidence in foster mother's ability as a parent.

v) Dr. Rosenblum recommends termination of [natural] mother's rights.

w) Dr. Rosenblum does not recommend termination of father's rights and suggested another permanency goal such as making foster mother the child's legal guardian and closing the case.

x) [S.M.] is entitled to maintain a meaningful relationship with both [foster mother and natural father].

y) Termination of father's rights may cause the child some confusion, as he is the father of her half-brother who is not dependent.

¶ 8 Based on the foregoing findings and after having "carefully considered and weighed the testimony of Dr. Rosenblum, a well respected professional," but noting that the "the weight to be given to the testimony of an expert is for the fact finder," the court concluded "that CYF had proven that termination of parental rights of both the natural mother and appellant best served the needs and welfare of this child." The court concluded that father had not remedied the conditions which led to S.M.'s removal and that he was not likely to remedy those conditions within a reasonable period of time. Of great significance to the court's determination was the following analysis:

This court finds that a result other than adoption by [M.F.] would leave the child in limbo with the possibility of being removed from [M.F.'s] care in the future. Removal and no contact with [M.F.] would cause the most harm to this child. The only guarantee that [S.M.] will remain with [M.F.] is for [M.F.] to adopt her. Hopefully [M.F.] will allow [S.M.] to continue her strong and loving relationship with her father.

¶ 9 Father now appeals and claims that the court's determination was not based on clear and convincing evidence. After careful review, we agree.

¶ 10 First, the court's determination was apparently based on the speculation that perhaps, if father's parental rights to S.M. were not terminated, he might, sometime in the future, whisk S.M. away from the loving care of M.F. We have searched and reviewed the record with a particular eye toward discovery of any showing that father perhaps harbors such an intention. The record, however, does not provide a basis, expressly or by implication, that such is the case.

¶ 11 M.F. did not testify at the hearing or in any previous proceedings contained in the record certified to this court. Moreover, the evidence actually presented at the hearing tended to show that father and M.F. continue to remain a relatively secure family unit. The court placed significant emphasis on the fact that when asked where he resides, father responded that he currently resides "between" his own apartment and the home of M.F. The court apparently read into father's response an implicit concession that the family unit, while perhaps unconventional, was so tenuous that S.M.'s security in the home of M.F. was compromised. Dr. Rosenblum, however, testified on direct examination as follows:

... My understanding is that S.M. has been living in the primary custody of her foster mother, [M.F.], for about four years now. [M.F.] is the long-term paramour of her father, [D.S.] and ... it's evident that [S.M.] has a concept of this being her family unit, and that would be [M.F.], her father and her [half-brother.] ...The family now resides in Munhall and while it's true that [the] people living in the home would be [S.M., her half-brother and M.F.], it's

pretty evident that [father] spends quite a fair amount of time in the home as well. Also, [father] does maintain a separate residence in West Mifflin which, I believe, is where everyone lived prior to April of 2001, about a year ago, when [M.F.] purchased a home in Munhall.

. . . .

Q. Can you explain your findings in regards to the interactional evaluation that took place between [S.M.] and [father]?

A. This evaluation also went quite well. [S.M.] seemed as comfortable and relaxed in meeting with her dad as she had with her mom, i.e., her foster mom. Father also showed a lot of patience. He was well aware of [S.M.'s] progress in school. They did some reading together. They played, did some puzzles, and it's quite evident that [S.M.] spends a lot of time with her father and that he's very proud of her and fully involved in her life. For example, he will take her to lessons on occasion, has met with her teachers. They spoke about [father] being a good cook. [S.M.] commented that her father is a good cook, and there was a lot of affection and a very strong relationship which I was able to observe with [father] evidencing some positive parenting skills.

. . . I would say that [M.F.] is the primary caregiver, but I'd have to say that [father] has a secondary, but still very significant, and relevant role in [S.M.'s] life.

. . . The problem I had with the goal of adoption is that legally this would remove father from a meaningful position in [S.M.'s] life, and there has been ongoing talk of marriage between [M.F.] and [father], so to remove [father's] status as a legal parent, I had some reservation about doing that considering the fact that this relationship with [S.M.] has been and continues to be a meaningful one.

Q. Have you discussed adoption with the foster mother, [M.F.]?

A. Yes, and it was a difficult situation for her to be in. What she told me is that she'd be willing to adopt if that was the recommendation of the Agency, although it did put her in a difficult position because certainly that is not the outcome that [father] was wanting for [S.M.]. So, it's difficult for her [M.F.] to go against his wishes or to actively support something that would deprive him of his legal rights as a father. Basically what she wants is simply to protect [S.M.] and, of course, to continue having [S.M.] living with her. [Father] is in the home as well. In fact, [S.M.] quite openly spoke about her father sleeping in the home, even though apparently the parents have been told that that's not allowed, but [S.M.] left no doubt that that still occurs.

Q. Given your observation, if [M.F.] was to adopt and was no longer pursuing a relationship with the birth father, do you think that, in your professional opinion, she would interfere with [S.M.] maintaining a relationship with her birth father?

A. No, she would not do that.

Q. In your professional opinion, would it be detrimental for the parental rights of the birth father to be terminated?

A. Well, yes, there are some disadvantages to his rights being terminated because he does play a meaningful role in [S.M.'s] life . . . .

Q. You stated that there would be some disadvantages, but would it be detrimental to the child?

A. It could be detrimental to the child.

THE COURT: In what respect?

A. If it interfered with father's access to—if it interfered with father's ability to remain involved with [S.M.], both in terms of physical and psychological de-

velopment, and also in terms of his ability to, let's say, have an opinion about educational matters, religious matters, et cetera. I believe they work as a couple. I believe there's joint decision-making, and that may continue, but again, [termination] would give him [father] the message that he has failed as a parent and, therefore, he's no longer legally entitled to maintain his relationship with his daughter.

... I can't predict the future, but I believe [S.M.] could be exposed to interpretations and to events which would reduce her father's access and level of involvement to [S.M.] and in that regard, be detrimental because she views her father as a meaningful, reliable, involved person in her life. She sees her [step] mother and her father as being there for her, not necessarily in equal proportion, but I don't know if that happens in every family anyway; but she sees them both as being very vital and meaningful to her life and expects that to continue.

¶ 12 In reviewing an order involving termination of parental rights, our scope of review is broad, and all the evidence as well as the hearing court's factual and legal determinations will be considered. *In re N.C.,* 763 A.2d 913, 917 (Pa.Super.2000). The standard of review is limited to determining whether the decree of the lower court is supported by competent evidence and whether it gave adequate consideration to the effect of such a decree on the welfare of the child. *Id.* (citing *Adoption of Atencio,* 539 Pa. 161, 650 A.2d 1064 (1994)).

In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Julissa O.,* 746 A.2d 1137, 1139 (Pa.Super.2000) (quoting *In re Adoption of Atencio,* 650 A.2d at 1066)(citations omitted).

¶ 13 Instantly, the court determined that the petitioning agency had proven by clear and convincing evidence that grounds for termination existed under any of the following three distinct statutory bases:

**§ 2511. Grounds for involuntary termination**

(a) **General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the con-

ditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court, or under a voluntary agreement with the agency, 12 months have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the children continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(2), (5), (8).

¶ 14 We recognize that the court was faced with a father who had not fully complied with its orders to provide weekly urine samples or to complete an outpatient drug rehab program. We recognize also that father's submitted urine samples twice resulted in a positive result for cocaine. We additionally recognize that the matters involved in this case,

> are of the utmost importance and seriousness. A parent's right to raise his child is one of the most basic rights of western civilization. It is so much a part of our cultural tradition that our courts have enshrined it with constitutional protection despite its absence from the document's text.

*In re Adoption of J.J.*, 366 Pa.Super. 94, 530 A.2d 908, 913 (1987) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). In terminating the rights of a parent, the court must give primary consideration to the developmental, physical and emotional needs and welfare of the child. 23 Pa.C.S.A. § 2511(b); *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 92 (1998). Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the

record could support an opposite result. *In re Adoption of Atencio, supra,* 650 A.2d at 1066 (Pa.1994); *In re Adoption of B.D.S.,* 494 Pa. 171, 431 A.2d 203, 206 (1981).

¶ 15 Here, the court's express determination was that CYF presented clear and convincing evidence that the termination of father's parental rights was in the best interests of the child. With this, we cannot agree.

¶ 16 While father has not always been an exemplary model of paternal duty and care, neither has he been, we conclude, so clearly deficient in those attributes as to justify the Commonwealth's irrevocable severance of the legal and natural parent/child bond. Almost one-half century ago, this court, per the Honorable Robert Woodside, eloquently stated that the law should not presume to build a "perfect" home for those unfortunate children whose mothers and fathers are less than perfect parents.

> The family is an institution which preceded governments. Its sanctity was universally recognized before judges or statutes or welfare organizations were known to man. The right of a child to a mother and a mother to a child are rights created by natural law. They are rights attributable to the nature of mankind rather than to the enactments of law.
>
> . . .
>
> A child cannot be declared "neglected" merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate

and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*In Re Rinker,* 180 Pa.Super. 143, 117 A.2d 780, 783 (1955). In the context of the present matter, we would add to the learned tabulation of good intentions and considerations that our law does not, absent clear and convincing evidence to the contrary, provide a procedure by which the relationships of children to a sometimes intemperate father may be legally broken on the hope that the step-mother whom the father has chosen for those children would be better suited as primary legal custodian. Here, there was no evidence that father caused the child to be without essential parental care. To the contrary, it was clearly shown that father developed a relationship with a paramour who is an excellent surrogate mother. There was no evidence that father, whatever his deficiencies as a parent, intended to break the bond between S.M. and her step-mother. Indeed, the expert's testimony revealed that there have been ongoing discussions between father and step-mother regarding the possibility of marriage, a potential union which, when coupled with natural mother's termination of parental rights, would leave the possibility of step-mother's adoption of S.M. a clearly viable course of legal action.

¶ 17 Moreover, the court terminated father's parental rights, in part, pursuant to 23 Pa.C.S.A. § 2511(a)(5) which requires, among other things, a showing that the child has been removed from the care of the parent for a period of at least six months, that the conditions which led to the removal continue to exist, are not likely to be remedied by the parent within a reasonable period of time and that termination of the parental rights would best serve the needs and welfare of the child. *In the Interest of L.S.G.,* 767 A.2d 587, 590 (Pa.Super.2001). The court found that "the conditions which led to the removal and placement of [S.M.] continue to exist. Specifically, father's drug and alcohol addiction and refusal to comply with treatment recommendations and submit to urine screens led to the removal of his daughter." Certainly, the record supports the court's identification of the conditions which led to S.M.'s "removal." However, despite the existence of those conditions, no adequate showing was made, as required under the subsection, that termination of father's parental rights would best serve the needs and welfare of the child. Rather, the evidence was that the needs and welfare of the child would be best served by maintenance of the parental bond, a fact which the court recognized when it opined that "this court hopes, of course, that foster mother will allow the child to continue her strong and loving relationship with appellant. In this case, this court recognized the need for this child to have a stable home with strong continuous parental ties." We fail to see how the legal termination of father's parental rights would work toward satisfying S.M.'s need for continued bonding with him. *See In re Adoption of A.C.H.,* 803 A.2d 224, 226 (Pa.Super.2002) ("we cannot underestimate the importance of a child's relationship with his or her biological parents [and] the fact that continuity of relationships is important to a child[.]") (citations omitted).

¶ 18 We are persuaded that the court's termination of father's parental rights was error, as the evidence presented did not clearly and convincingly show that termination would be in the child's best interest. We conclude that the court's determination was based on a speculative analysis that if termination were not ordered, father might in the future, as legal guardian of S.M., remove her from the nurturing and loving care of M.F. However, there was no

evidentiary basis upon which the court could clearly and convincingly come to that conclusion. There simply was no evidence to suggest that father had any intention to remove S.M. from step-mother's care. We conclude that the court erred on the basis of factual insufficiency and, accordingly, we reverse.

¶ 19 The order which involuntarily terminated father's parental rights to S.M. is reversed. Jurisdiction is relinquished.