J-A21007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 744 EDA 2022 |

Appeal from the Order Entered February 22, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000650-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 745 EDA 2022 |

Appeal from the Decree Entered February 22, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000160-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: N.C.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 746 EDA 2022 |

Appeal from the Decree Entered March 16, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000161-2021

BEFORE:  LAZARUS, J., MURRAY, J., and McCAFFERY, J.

J-A21007-22

MEMORANDUM BY LAZARUS, J.:                    **FILED OCTOBER 21, 2022**

J.M. (Mother) appeals[1] from the decrees, entered in the Court Common Pleas of Philadelphia County, Juvenile Division involuntarily terminating her parental rights to A.M (born August 2009) and N.C.S. (born August 2019) (collectively, Children),[2] and the order changing A.M.'s dependency goal from reunification to adoption. After careful review, we affirm.

On March 24, 2016, A.M. was adjudicated dependent following a petition filed by the Philadelphia Department of Human Services (DHS) due to safety and welfare concerns regarding Children.[3] On October 20, 2016, the court entered an order reunifying Mother and A.M. prior to the next court date, and conditioned upon Mother providing proof of income to Community Umbrella Agency (CUA), submitting to drug screenings, as well as by agreement of the parties. **See** DHS Exhibit 4, at 54. On January 17, 2017, A.M. was reunited

_____

[1] Mother has filed three separate notices of appeal with one docket number on each notice. Thus, Mother has complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), which held that "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each of those cases." **See also** Pa.R.A.P. 341(a). We have consolidated the appeals sua sponte for ease of disposition. **See** Pa.R.A.P. 513 (consolidation of appeals).

[2] A.M., A.L.M., and A.L. are used in the caption and briefs to refer to the same child. N.C.S. and N.M. are used to refer to the other child. Here, we use the initials used by the trial court which are A.M. and N.C.S.

[3] This Court was not provided with further facts on this matter as the 2016 adjudication is not on appeal.

- 2 -

with Mother. N.T. Termination Hearing, 6/16/21, at 80. Court supervision was terminated on January 19, 2017. DHS Exhibit 4, at 54.

However, on July 27, 2017, DHS received a General Protective Services Report (GPS Report) citing concerns about Mother's substance abuse and mental health, the family's access to appropriate housing and adequate food, and A.M.'s truancy. N.T. Termination Hearing, 6/16/21, at 80. The GPS Report also alleged that Mother and two of A.M.'s siblings were attacked by the paramour of A.M.'s sibling's father. Trial Court Opinion, 4/28/22, at 2. On October 17, 2017, DHS obtained an order of protective custody for A.M. N.T. Termination Hearing, 6/16/21, at 80. Upon learning of the order, Mother fled with A.M. On November 7, 2017, A.M. was again adjudicated dependent and has remained in DHS' care ever since. DHS Exhibit 4, at 57. Mother and Mother's counsel appeared for adjudication. *Id.* An initial permanency review hearing was held on March 19, 2018, at which time the permanency goal for A.M. was reunification. *Id.* at 59-60.

On August 27, 2019, N.C.S. was born at 34-weeks' gestation. On September 5, 2019, DHS received a GPS report alleging that Mother tested positive for methadone at N.C.S.'s birth, fell asleep while holding N.C.S., accused the hospital of abusing N.C.S., and almost knocked over N.C.S.'s crib. N.T. Termination Hearing, 6/6/21, at 88-89. On December 9, 2019, at five months old, N.C.S. was adjudicated dependent and has remained in DHS' care since then. *Id.*, 12/17/21, at 42. An initial permanency review hearing was

held on January 21, 2020, at which time the permanency goal for N.C.S. was reunification.[4]  DHS Exhibit 6, at 23.

On March 23, 2021, DHS filed petitions to change A.M.'s permanency goal from reunification to adoption and to terminate Mother's parental rights to both Children.  Termination hearings took place over four days on June 16, 2021, September 22, 2021, December 17, 2021, and February 22, 2022.

Joshua Hage,[5] a CUA case management supervisor, and Sakina Gaines, a case manager director at Turning Points for Children, each testified regarding Mother's compliance with her case plan objectives.  C.C., A.M.'s pre-adoptive resource parent, testified regarding C.C.'s bond with A.M.  William Calandra, Esquire, A.M.'s child advocate, appointed to represent her wishes and best interests, testified regarding A.M.'s understanding of adoption and relationship with C.C.  Y.B., one of N.C.S.'s pre-adoptive resource parents, testified regarding N.C.S.'s bond with both Y.B. and A.F., Y.B.'s fiancé.[6] Tracey Chambers-Coleman acted as the guardian *ad litem* (GAL) for Children.

Hage testified that Mother's single case plan objectives are to: (1) address drug and alcohol concerns and submit random drug screens at the

---

[4] N.C.S.'s permanency goal was not changed to adoption as M.S. had been identified as her biological father.  The DNA test result was distributed at the February 22, 2022 hearing.  N.T. Termination Hearing, 2/22/22, at 9.

[5] Hage was the CUA case management supervisor for Mother and Children from November 11, 2019 to November 2020, and was reassigned this case on May 14, 2021.  N.T. Termination Hearing, 6/16/21, at 78-79.

[6] A.F. is also N.C.S.'s pre-adoptive resource parent.  N.T. Termination Hearing, 2/22/22, at 5.  A.F. did not testify at the termination hearings.

Clinical Evaluation Unit (CEU); (2) address mental health concerns and medication management; (3) attend Achieving Reunification Center (ARC) for domestic violence and anger management; (4) obtain stable housing; and (5) comply with supervised visitation. N.T. Termination Hearing, 6/16/21, at 83.

Gaines testified that Mother has an extensive drug history. *Id.*, 10/17/21, at 39. Gaines also testified that she was concerned that Mother is not currently enrolled in a drug and alcohol treatment program because without proper support relapse is possible. *Id.*, 12/17/21, at 41. Indeed, Hage testified that Mother had relapsed and used PCP in December 2019; Mother resisted treatment at this time. *Id.*, 6/16/21, at 85, 100.

Additionally, according to Hage, Mother has completed drug screening through Gaudenzia,[7] but CUA is unable to determine if these screens were random because Mother retracted a previously signed release. *Id.* at 85-86. Mother also retracted previously signed releases from Best Behavioral Healthcare [BBH]. *Id.* at 124. Additionally, although Mother has stated that there are times when she is compliant with services, Hage has not noticed any progress or positive change in Mother. *Id.* at 101.

Regarding Mother's mental health diagnosis, Gaines testified that Mother has major depression, post-traumatic stress disorder, and bipolar disorder. *Id.* at 42. Additionally, Hage testified that Mother also has been diagnosed with schizoaffective disorder. *Id.* at 121.

---

[7] Gaudenzia is facility offering substance abuse treatment programs.

Gaines noted that she is concerned about consistency in treatment because Mother has received treatment from many different facilities. *Id.*, 12/17/21, at 38. Indeed, Gaines testified that Mother has been at various behavioral health treatment facilities, including: Gaudenzia; Community Behavioral Health; Greater Philadelphia Health Action; BBH; Al-Assist; and NorthEast Treatment Center.[8] *Id.* at 38-39. Additionally, Mother has been at the Wedge Recovery Centers (the Wedge) since August 2021. *Id.*

Moreover, Gaines stated: "[M]other has not been extremely consistent with her mental health. Her response behaviors in some visits have been concerning." *Id.* Specifically, during a visit, Mother threatened a case aide who was unable to see Mother and N.C.S. The case aide asked Mother to reposition herself to allow the aide to observe her. Mother's response to the case aide was, "You must know where [I am] from. [You have] got to read about me. You must know what [I am] capable of doing." *Id.* at 79-80. Additionally, Mother keyed a supervisor's car and followed case workers out to their cars after court hearings. *Id.* at 97, 117.

Hage testified that due to Mother's behavior, visits were moved from CUA to DHS. *Id.*, 6/16/21, at 91-92 ("So, due to [Mother's] erratic behaviors and threats that were made to the [] CUA case mangers[, ] we decided to request that the visits not be held [at] the CUA agency any longer, and moved

_____

[8] These facilities, as well as the Wedge, support and advocate for individuals with behavioral health challenges, including drug and alcohol addiction and mental illness.

to DHS, [because] it has more security there."). N.C.S.'s visits with Mother are still supervised at DHS. *Id.*

Mother's erratic behavior also prevented her from having a bonding evaluation completed, something that was court ordered and scheduled at Assessment & Treatment Alternatives (ATA) in April 2019. According to Gaines, this evaluation was not completed due to Mother's conduct. *Id.*, 12/17/21, at 37 ("[M]other was in an irate state, and [Mother] was essentially banned from ATA, and no longer allowed to come back.").

Hage and Gaines each testified that Mother has not completed a domestic violence program despite past domestic violence issues between Mother and Father. *Id.* at 26; *id.*, 6/16/21, at 119-121. Additionally, although Mother testified that she was approved for housing, beginning December 22, 2021, the home was conditioned on Mother being reunified with all seven of her children. *Id.*, at 12/17/21, at 68-69. CUA was provided with an unsigned lease and CUA has been unable to contact the landlord to confirm that housing has been acquired. *Id.* at 70, 96.[9] Further, although Mother testified that she is employed part-time and receives social security disability payments, Hage testified that CUA does not have documentation of either. *Id.* at 159-60, 162, 176; *id.*, 6/6/17, at 119-21.

---

[9] "Mother's counsel represented to the trial court that although the lease provided to CUA was not signed by the landlord, the lease had since been signed. The trial court accepted counsel's representation, as an officer of the court, that the lease was signed by the landlord later." Trial Court Opinion, *supra*, at n. 5.

Hage also testified regarding Mother's compliance with visits. Mother has missed visits with Children alleging that she was in the hospital:

> So, typically [Mother] would say that she was hospitalized during [] the visit that she had missed. Typically, [Mother] would let us know about 15 [to] 20 minutes before the visits would happen. We requested documentation for those hospital stays, so we were able to make up the time that she had missed, but she had stated that the documentation was sent to her attorney. When we tried getting the documentation from the attorneys, we either did not get a response or the attorney said that they did not receive the documentation.

*Id.* at 91. Additionally, Hage testified that during a visit on October 13, 2021, Mother was observed, "telling A.M. [] that she needs to come home, she wants to come home." *Id.* at 92-93.

C.C., who has been A.M.'s resource parent for the past three years, testified regarding her bond with A.M. *Id.*, 12/17/21, at 24. C.C. views A.M. "[l]ike [she is] my child. [She is] part of the family … [we are] a dynamic duo. She loves me and I love her. *Id.*, 9/22/21, at 22. Additionally, C.C. stated, "[w]e don't have any concerns with her in school. Like I said when I went to back[-]to[-]school night, her teachers had nothing but pleasant things to say about her." *Id.* at 24-25. C.C. also testified that, "[W]hen [A.M.] first came, she was still tell[ing] a lot of stories, and she used to steal. I used to get phone calls everyday from school and after care." *Id.* at 21-22. Moreover, according to C.C., A.M. feels comfortable enough with C.C. to discuss the foster care process and that "[s]ometimes we sit down, and we talk about everything." *Id.* at 30.

Further, Gaines testified that A.M. is "thriving" in her current placement. *Id.*, 12/17/21, at 26. For example, while in C.C.'s care, A.M. has "stabilized" through participation in therapy, dance, and musical theatre. *Id.*, 10/22/21, at 29. Conversely, A.M. exhibits behavioral issues for approximately a week following visits with Mother. *Id.* at 31. Indeed, A.M.'s visits with Mother are virtual because in-person visitation would lead to decompensation of A.M.'s behavior. *Id.*, 12/17/21, at 35. C.C. testified that she has concerns about A.M. continuing to visit with Mother, "[b]ecause it changes [A.M.'s] mood and [it is] not a good mood." *Id.*, 9/22/21, at 33.

Calandra, who was appointed as A.M.'s legal counsel in late 2020 has had "several opportunities to meet with [A.M.] with regard to her understanding of permanency." *Id.*, 12/17/21, at 102. Counsel testified as follows:

> What I have found is that [A.M.] is an extremely bright, thoughtful child, and [is] capable of grasping the understanding of what permanency mean[s] in her life. [A.M.] indicated to me that she is extremely happy in [C.C.'s home].
>
> [A.M.] shares a terrific relationship with [C.C.] . . . and feels loved by [C.C]. [A.M.] feels well cared for and protected by [C.C.], and safe when she is with [C.C.]
>
> [A.M] wishes to remain in the care of [C.C.], and to be adopted by [C.C]. [A.M.] also wishes to maintain discretion over further contact with [Mother] going forward.
>
> But it was clear to me that [A.M.] requests permanency. This has been [] five years that have been extremely difficult for her. And, as a 12-year-old, she is capable of making that decision, and I would ask that the [c]ourt accept her position.

*Id.* at 102-03.  Similarly, C.C. testified that "[A.M] keeps thanking me for adopting her." *Id.*, 9/22/21, at 24.

Y.B., N.C.S.'s pre-adoptive parent, testified regarding the bond among him, A.F., and N.C.S.  Y.B. testified that, "[N.C.S.] is like our best friend.  [A.F.] loves [N.C.S.] more than she loves me.  [That is] for sure[.] [We are] mommy and daddy to [N.C.S.]" *Id.*, 10/22/21, at 29.  Indeed, N.C.S., now two years old, has been living with Y.B. since N.C.S was five months old.  *Id.* at 42; *id.*, 6/16/21, at 96.  Additionally, N.C.S. refers to Y.B. and A.F. as "mom and dad".  *Id.*, 12/17/21, at 42.  Y.B. also testified that after visits with Mother, N.C.S. "would just be crying, having a fit.  When she comes out, she is soaked [in] urine.  Her diaper [is not] changed.  She has food, candy[,] in her teeth.  [She is] stinky." *Id*. at 52.

The court terminated Mother's parental rights to A.M. (decree entered on February 22, 2022)[10] and N.C.S. (decree entered on March 16, 2022) pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[11]  On February 22, 2022, the court changed A.M.'s permanency goal from reunification to adoption.  Mother filed timely notices of appeal.  Both Mother and the trial court have complied with Pa.R.A.P. 1925.  Mother identifies the following issues for our review:

---

[10] A.M.'s Father's parental rights were also involuntary terminated on February 22, 2022.

[11] 23 Pa.C.S.A. §§ 2101-2938.

1. The [trial court] erred in changing [A.M.'s permanency] goal from reunification to adoption.

2. The [trial court] erred in dismissing the Petition and Rule to Show Cause without any evidentiary hearing.

3. The [trial court] erred in determining that DHS/CUA used reasonable efforts to reunify [Mother and Children] when there have been 11 CUA workers during this matter[,] [DHS/CUA] did not conduct family finding and place the child with a kinship provider [and where] Mother was told that they would not move [Children].

4. The [trial court] erred in [its] rulings when Mother was fully compliant with her single case plan objectives [and] Mother completed her objectives prior to the filing of the Petition for Termination of Parental Rights.

5. The [trial court] erred in making a final ruling without the results of the bonding evaluation which had been ordered but never completed.

6. The [trial court] erred in disregarding the [Behavioral Health System (BHS)] evaluation [where there was no expert testimony that any issues presented a nexus between Mother's mental health and Mother's ability to parent [C]hildren [and where the evaluation] did not state that Mother was not able to parent [C]hildren due to any underlying mental health issues of Mother [and where] BHS' evaluation only stated that Mother could benefit from therapy which Mother was compliant with.

7. The [trial court] erred in not considering the bond that exists with Mother and [Children] as well as both of [Children's] bonds with [their siblings].

8. The [trial court] erred in disregarding [Children's] and Mother's rights to due process and their constitutional rights to have reasonable efforts used to reunify each other them with the other and the other children.

9. The [trial court] erred in not interviewing [A.M.] to ensure that her wishes were taken in to account.

10. The [trial court] was given inaccurate information as to Mother's criminal record [insofar as] her criminal charges were dismissed.

11. Because of the turnover in case managers/CUA workers, there has been no continuity in services and assistance to Mother. Despite this and during the pandemic of 2020, Mother [completed] all of her single case plan objectives. Her permanency worker has reviewed all of Mother's documents which were entered into evidence and has stated that Mother has been fully compliant.

Appellant's Brief, at 4-5 (reworded for clarity).[12]

This Court reviews a trial court's decision in a dependency case for an abuse of discretion or an error of law. *In re J.T.R.*, 9 A.3d 1179, 1181 (Pa. 2010). We must accept the findings of fact and credibility determinations of the trial court if they are supported in the record. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). We emphasize that the trial court was in the best position to view the evidence and we give great deference to the trial court's determinations that are supported in the record. Indeed, our job as an appellate court is to review for an abuse of discretion, not to reweigh the evidence. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

In a proceeding to involuntarily terminate parental rights, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of the grounds for doing so. *In re Adoption of G.L.L.*, 124 A.3d 344, 346 (Pa. Super. 2015); *In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003). Clear and convincing evidence is defined as

---

[12] Mother lists issue 10, concerning inaccurate information provided to the court regarding her criminal convictions, in her Rule 1925(b) statement and in her appellate brief. However, she omits the issue from the argument section of her appellate brief. As such, we find this claim waived. *See* Pa. R.A.P. 302(a).

testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* A court examines whether the totality of the circumstances, including the individual circumstances of each case and all explanations offered by the parents, clearly warrants termination. *Id.* The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004).

Sections 2511(a)[13] and (b) of the Adoption Act[14] govern involuntary termination of parental rights. The relevant subsections are as follows:

> (a)(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> (a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

---

[13] We can affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection of 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

[14] 23 Pa.C.S.A. § 2511(a) (Grounds for involuntary termination); *id.* at 2511(b) (Other considerations).

(a)(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(a)(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

(b) The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).

First, our review of the record reveals that the trial court did not abuse its discretion in involuntary terminating Mother's parental rights to Children under section 2511(a) and (b). Second, the trial court did not err in changing A.M.'s permanency goal from reunification to adoption. Third, we find that

DHS/CUA made reasonable efforts to reunite the family due to their ongoing support of Mother.

In issues 4 and 6, Mother argues the trial court erred in terminating her parental rights under sections 2511(a)(1), (2), (5) and (8) because she was fully compliant with her single case plan objectives before DHS filed the petitions to involuntary terminate her parental rights. Appellant Brief, at 18. This argument is belied by the record.

Here, the trial court explained its decision to terminate Mother's parental rights under section 2511(a)(1) as follows:

> Mother has an extensive substance abuse health history. While Mother is engaged in mental health treatment at [t]he Wedge, [] Gaines testified that she was unsure if they had a full picture of Mother's mental health history and diagnosis due to Mother's previous refusal to sign mental health releases for her treatment at [BBH], and Mother's refusal to sign releases allowing CUA to speak with the Wedge about Mother's treatment. Additionally, [Gaines] testified that because of Mother's inconsistent mental health treatment and persistent threatening behaviors, she had concerns regarding Mother's mental stability. []Gaines testified that she had concerns regarding Mother's aggressive and erratic behavior despite completing an anger management course. [Hage] and [Gaines] testified that Mother never completed her SCP objective of completing a domestic violence course. Additionally, Mother has not visited the Children consistently and her visits never progressed further than supervised at CUA/DHS. [Hage] testified that due to Mother's aggressive behaviors and threats made to CUA staff, Mother's visits were moved from supervised at CUA to supervised at DHS because DHS is able to provide more security than the CUA agency.
>
> Fully complying with her objectives would have demonstrated Mother's interest in caring for A.M. and N.C.S. However, Mother failed to make a substantial effort to fulfill these objectives. Accordingly, this [c]ourt found that termination of Mother's

- 15 -

parental rights was warranted pursuant to [subsection] 2511(a)(1).

Trial Court Opinion, *supra*, at 17-18.

The record fully supports the trial court's determination that there exists clear and convincing evidence that termination is appropriate under section 2511(a)(1). Concerns still exist regarding Mother's drug and alcohol use because CUA is unable to determine if Mother has been compliant with random drug screenings, Mother is resistant to treatment, Mother's sobriety has been inconsistent, and Mother is not currently enrolled in a drug treatment program. N.T. Termination Hearing, 6/16/21, at 41, 85-86, 100, 104. Additionally, Mother has not completed a domestic violence or anger management course[15] and still exhibits aggressive an erratic behavior during visits with Children. *Id.* at 97, 117, 119-20. Mother has also not completed her objectives of consistently attending supervised visitation, obtaining stable housing, or providing CUA with documentation of employment and benefit programs she is allegedly enrolled in. *Id.* at 121; *id.*, 12/17/21, at 70, 96. The trial court did not abuse its discretion in terminating Mother's parental rights under section 2511(a)(1) because Mother has failed to make a substantial effort to fulfill her single case plan objectives and, thus, as failed to perform her parental duties.

_____

[15] It is noted that Mother's brief demonstrates that she has competed an anger management workshop through Community Council Health Systems. *See* Appellant's Brief, at Appendix B (Certificate of achievement for completion of manger management workshop dated 5/3/21).

In issues 5 and 7, Mother argues the trial court erred in terminating her parental rights under section 2511(b)[16] where no bonding evaluation was completed, A.M. did not express her wishes regarding adoption directly to the trial court,[17] and the Children's bonds with their five other siblings were not considered. Appellant's Brief, at 60-63. This argument is meritless.

Indeed, the trial court did not err in proceeding without the results of a bonding evaluation. There is no requirement that a formal bonding evolution be performed under section 2511(b). *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008) ("[s]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act."). Nevertheless, a bonding evaluation was scheduled in April 2019, but was not

---

[16] Section 2511(b) requires the court to give "adequate consideration [] to the needs and the welfare of the child." *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa. Super. 2002). Specifically, the court determines whether "a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). In cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

[17] The relevant consents necessary for adoption are as follows:

(a) General Rule. – Except as otherwise provided in this part, consent to an adoption shall be required of the following:

(1) The adoptee, if over 12 years of age.

23 Pa.C.S.A. § 2711. A.M. is over 12 and, thus, A.M. must consent to the adoption. N.C.S. is under 12 and, thus, her consent is not necessary under section 2711.

completed due to Moher's erratic conduct at ATA. N.T. Termination Hearing, 12/17/21, at 37. Further, the trial court properly determined that A.M. understands adoption and, consistent with Calandra's testimony, wants to be adopted. *Id.* at 102-03. Moreover, although Mother argues that the trial court should have interviewed A.M. regarding her wishes, Mother's counsel did not request that A.M. be present at the termination hearings. Trial Court Opinion, *supra*, at 26.

Additionally, the trial court found that termination of Mother's parental rights would not cause irreparable harm to the Children because the Children do not look to Mother for Children's needs to be met. Trial Court Opinion, *supra*, at 25-26. Indeed, Mother negatively impacts A.M., as evidenced by decompensation of A.M.'s behavior following visits with Mother. N.T. Termination Hearing, 12/17/21, at 35. By contrast, A.M.'s behavior has improved in school and after-care since under C.C.'s care. *Id.*, 9/22/21, at 21-22. Similarly, termination of Mother's parental rights to N.C.S. will not destroy an existing beneficial relationship between them because N.C.S. often cries the entire visit with Mother. *Id.*, 12/17/21, at 100. By contrast, N.C.S. calls Y.B. and A.F. "mom and dad." *Id.* at 42.

Moreover, the trial court considered the bond between Children and their five other siblings who are also currently in DHS' care:

> [The trial court] is mindful that siblings have a right to see each other. On February 22, 2022, Mother's parental rights were terminated. [The trial court] did not issue an order stating that the siblings are not permitted to visit each other. Testimony reflects that some of the resource parents of [] Children have a

relationship. Visits between the siblings have been occurring separate from Mother's visitation with the children because the different resource parents have social engagements.

Trial Court Opinion, *supra*, at 27.  This is supported by Gaines' testimony:

LINDA WALTERS, ESQUIRE:[18]  And how many times, outside of the visits, do all seven children–since you came on, from September 1 to now, how many times have all of the resource parents gotten together to have the seven kids see each other?

GAINES:  I [cannot] say all seven, but, for the most part, majority of them, often.  It can be at least twice or once a month, aside from what we essentially had put in place to ensure that it does occur.

They are very close in proximity to one another, so, they make sure that they go to whatever engagements of another sibling, and that is something that those particular resource parents ensure that occurs.

*See* N.T. Termination Hearing, 10/17/22, at 75-76.  In light of the foregoing, the trial court did not abuse its discretion in determining that termination of Mother's parental rights would be in the Children's best interest because there is no evidence demonstrating a beneficial bond between Mother and Children. *In re J.D.W.M*, *supra*; *In re Z.P.*, *supra*.

In issues 1, 9, and 11, Mother argues that by denying Mother's motion entitled "Preliminary Objections to Petition for Involuntary Termination/Petition to Return Custody to Natural Biological Mother/Finding No Reasonable Efforts"[19] the trial court did not consider all information

---

[18] Linda Walters, Esquire, served as counsel for Mother at the termination hearings.

[19] The motion was filed on December 16, 2021 and, thus, was timely appealed.

regarding whether to change the goal from reunification to adoption as required by 42 Pa.C.S.A. § 6351(f) of the Juvenile Act. This argument as no merit.

The trial court held its decision regarding the motion in abeyance after the December 17, 2021 hearing until February 22, 2022, to allow DHS counsel to review the motion. Trial Court Opinion, **supra**, at 15; N.T. Termination Hearing, 2/22/22, at 7. Additionally, the trial court determined that the exhibits attached to the motion "mirrored" the exhibits Mother presented at the prior termination hearings and, thus, testimony elicited at "an evidentiary hearing on the [m]otion would be substantially similar, if not the same, as the testimony that was elicited throughout the [prior termination hearings]." **Id.** at 15-16; **see** N.T. Termination Hearing, 2/22/22, at 8. We agree that a separate hearing on the motion would be superfluous. Thus, the trial court did not abuse its discretion in dismissing the motion without a hearing.

Additionally, the trial court did not abuse its discretion by changing A.M.'s permanency goal under section 6351(f)[20] where A.M. is "thriving" in

---

[20] In relevant part, section 6351(f) requires that the court consider the following factors during permanency proceedings:

(1) [] the continuing necessity for and appropriateness of the placement;

(2) [] the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child;

*(Footnote Continued Next Page)*

her current placement and Mother has not made consistent progress with her single case plan objectives. *Id.*, 12/17/21, at 26. Indeed, A.M. has "stabilized" while with C.C. through participating in therapy, dance, and musical theatre. *Id.*, 10/22/21, at 29. Conversely, A.M. exhibits behavioral concerns for approximately a week following visits with Mother. *Id*. at 31. Further, as discussed *supra*, the concerns necessitating the original placement have not been alleviated, including Mother's drug and alcohol dependency, anger management, and lack of housing. Indeed, Hage has not noticed any progress or positive change in Mother. N.T. Termination Hearing, 6/16/21, at 101. Finally, Mother's visitation with A.M. is inconsistent. *Id.*, 12/17/21, at 35. As such, the trial court did not err in changing A.M.'s goal from reunification to adoption.

---

(3) [] the extent of progress made toward alleviating the circumstances which necessitated the original placement;

(4) [] the appropriateness and feasibility of the current placement goal for the child;

(5) [a] project[ed] likely date by which the goal for the child might be achieved;

* * *

(6) [] whether the child is safe.

42 Pa.C.S.A. § 6351(f); *see also In re: S.B.*, 943 A.2d 973 (Pa. Super. 2008).

Finally, in issues 2, 3, and 8, Mother argues that CUA/DHS did not use reasonable efforts to reunify the family or place Children in a kinship home and, thus, violated Mother's and Children's due process and constitutional rights to reunification. Specifically, Mother claims there has been turnover in case managers and CUA workers and a lack of continuity in services provided. Appellant's Brief, at 64, 67. This argument is unsupported by the record.

Although there has been turnover in case workers, Mother has received appropriate assistance from CUA throughout this process. Gaines testified that "[Mother] had permanency specialists working with her, hand[-in-]hand with her objectives." N.T. Termination Hearing, 10/17/21, at 44. For example, Mother was driven to Friends Rehabilitation Program, a drug treatment facility, by a permanency specialist. *Id.* at 58. Gaines also testified that although Mother has been resistant to assistance, support has always been in place for Mother. *Id.* For example, Mother was referred to Addiction Recovery Center (ARC) for treatment but was discharged due to noncompliance. After discharge, a parent must enroll in services on their own; Mother never re-enrolled. *Id.* at 50. Additionally, Hage testified that CUA tried to help Mother get assessed for inpatient therapy when she admitted to using PCP in December 2019; Mother failed to do so. *Id.*, 6/16/21, at 100. Indeed, a review of the record shows that Mother has been continuously supported by DHS/CUA.

Regarding kinship placement, Mother's argument is similarity belied by the record. Testimony shows that CUA explored the list of possible placements

for Children but was not able to find appropriate caregivers. *Id.*, 12/17/21, at 53-54. For example, although Children's maternal grandmother had once taken care of Children, DHS determined she was not an appropriate resource because under her care, Children were not dressed appropriately, and grandmother's house contained "bugs." *Id.*, 10/22/21, at 122. Additionally, CUA attempted to assess maternal grandmother's home on January 3, 2020, but were unable to assess the whole home because some doors were locked. *Id.*, 6/16/21, at 87. Thus, the record indicates that, despite the turnover in caseworkers, reasonable efforts were made by DHS/CUA to support Mother and place the Children in kinship care. Therefore, Mother is entitled to no relief on this claim.

This Court has painstakingly reviewed the record herein and concludes that the trial court did not abuse its discretion in ordering Mother's parental rights to be terminated to both A.M. and N.C.S. Additionally, the trial court did not err in changing A.M. permanency goal from reunification to adoption. *In re T.S.M.*, *supra*; *In re J.T.R.*, *supra*.

Order and decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2022

- 23 -