J-S05019-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: A.J.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1038 WDA 2022 |

Appeal from the Decree Entered August 12, 2022
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
28A in Adoption 2022

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: A.L.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1039 WDA 2022 |

Appeal from the Decree Entered August 12, 2022
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
28 in Adoption 2022

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED:  March 22, 2023**

A.A.C. ("Mother") appeals from the decrees,[1] entered in the Court of

Common Pleas of Erie County, involuntarily terminating her parental rights to

her two children, A.L.V. (born August 2017), and A.J.R. (born March 2021)

---

[1] We have, *sua sponte*, consolidated these appeals.  *See* Pa.R.A.P. 513;
Pa.R.A.P. 2138.  The parental rights of Children's biological fathers were also
terminated.  They are not involved in this appeal.

(collectively, "Children"). After our review, we affirm on the basis of the opinion authored by the Honorable Shad Connelly.

The trial court opinion sets forth a comprehensive review of the factual and procedural history of this matter, as well as a detailed summary of the termination hearing testimony. In brief, Mother and Children became involved with the Erie County Office of Children and Youth ("OCY") after New Jersey Children's Services alerted OCY to the fact that the family was traveling back and forth between New Jersey and Erie. The New Jersey agency had become involved with the family as a result of concerns about Mother's untreated mental health issues, drug and alcohol use, domestic violence, and failure to meet Children's needs. After multiple attempts, OCY was able to locate the family at a motel where Mother had left A.J.R., then only six months old, by herself. Children were detained and a shelter care hearing was held on October 14, 2021. Upon being taken into custody, the Children were found to have scabies, strep throat, and severe diaper rash. On October 15, 2021, OCY filed dependency petitions. A combined adjudicatory/dispositional hearing was held on October 26, 2021, after which the court found Children to be without proper care or control, subsistence, education, or other care necessary for their physical, mental, or emotional health and adjudicated them to be dependent. The court instituted a permanency plan and Children were placed in the legal and physical custody of OCY.

A permanency review hearing was held on January 26, 2022, after which the court found that Mother had been minimally compliant with her

permanency plan and in alleviating the circumstances that led to Children's placement. On February 25, 2022, the court issued an order conditioning Mother's visitation on her being alcohol- and drug-free after Mother repeatedly tested positive for fentanyl. A second permanency review hearing was held on May 2, 2022, after which the court found Mother to be non-compliant with her permanency plan. The court further found that Mother had made no progress toward alleviating the circumstances that led to Children's placement. Finally, the court ordered that the permanency goal be changed to adoption.

On May 10, 2022, OCY filed petitions to involuntarily terminate Mother's parental rights to Children. Following a full evidentiary hearing,[2] on August 11, 2022, the court issued decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (b). Mother filed timely notices of appeal and Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal. She raises the following issues for our review:

> [1.] Whether the Orphans' Court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2) and (5)?
>
> [2.] Whether the Orphans' Court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. §§ 2511(b)?

---

[2] Children were represented at the hearing by Steven E. George, Esquire, who also served as guardian *ad litem*. Attorney George has not filed an appellate brief.

Brief of Appellant, at 3.

In cases involving the termination of parental rights, "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." *In re Z.P.*, 994 A.2d 1108, 1115 (Pa. Super. 2010). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (en banc) (internal citations omitted). "[W]e employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *Id.*

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted).

> Parental rights may be involuntarily terminated where any one subsection of [s]ection 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the

- 4 -

parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his . . . parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

**In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted).

Here, the trial court terminated Mother's parental rights under section 2511(a)(1),[3] which provides that the parental rights of a parent may be terminated where:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. §§ 2511(a)(1).

In terminating under subsection (a)(1), the court noted Mother's failure to address "any of the issues" that led to Children's removal, despite the best efforts of OCY. Trial Court Opinion, 10/27/22, at 14. Mother failed to attend parenting classes, domestic violence treatment, or mental health therapy or, if she did attend, claimed to have no problems. **See id.** When OCY made referrals for safe housing, Mother either lied about utilizing those services or left because she would not follow the rules. **See id.** Mother failed to participate in drug treatment programs and continually denied drug

---

[3] We may affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection of section 2511(a). **In re L.M.**, **supra**.

- 5 -

involvement. On the "infrequent occasions" Mother appeared for court-ordered urinalysis, she tested positive for fentanyl, while continuing to maintain that she did not use drugs. *Id.* at 15. The court concluded:

> A.A.C. has no credibility when she claims she is now attempting to straighten out her life. Her actions throughout [the involvement of OCY and New Jersey Children's Services] evidence a woman who has no desire to act as a parent. As A.A.C. testified [at the termination hearing], she placed others before her children. Her actions corroborate that she has and will continue to subvert her children's well-being for her own desires.
>
> . . .
>
> [M]other has clearly shown that she has no desire to change her attitude or actions toward parenting, no matter how much at risk it places her children. A.A.C. rejected all services and efforts during the course of [OCY's] involvement, and termination of her parental rights under subsection (a)(1) is appropriate.

*Id.* at 16-17.

The trial court's findings are fully supported in the record, and we can discern no abuse of discretion or error of law in the court's conclusion that termination is appropriate under subsection (a)(1).

Under section 2511(b),[4] the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.

_____

[4] Subsection 2511(b) provides:

> **(a)** *Other considerations.*--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the

Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.*

Here, the trial court found that the "evidence demonstrated that severing contact with [] Mother has not had any detrimental effect on [ C]hildren." Trial Court Opinion, 10/27/22, at 18. In fact, certain "destructive behaviors" previously engaged in by A.L.V., the older child, abated once contact with Mother ceased.[5] The court noted:

> [A.L.V.] no longer had night terrors or was fearful someone would come to the foster home and steal her. Therapy to work through the traumatic events of A.L.V.'s life are ongoing and have shown promise. Subjecting a child to drugs, guns, violence, fear for safety, and being left alone are not factors which would lead a child to have a strong[,] positive relationship with a parent.

*Id.*

Children are currently in a loving foster home. While this family is not an adoptive resource, they are "committed to treatment for A.L.V." and to

---

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

[5] Because she was only six months old when she was removed from Mother's care, we can only surmise that A.J.R. did not suffer the same psychological trauma from her exposure to Mother's activities as A.L.V.

- 7 -

facilitating a transition to a "forever home." *Id.* at 9, 10. OCY is actively seeking an adoptive home for Children, who will be adopted together, as they are "very attached to each other." *Id.* at 10. The court concluded that the interests of Children are best served by terminating Mother's parental rights, and we can discern no abuse of discretion or error of law.

We have reviewed the parties' briefs, the certified record, and the applicable law and conclude that Judge Connelly's opinion thoroughly and correctly disposes of the issues Mother raises on appeal. Accordingly, we affirm on the basis of that opinion and instruct the parties to attach a copy of that document in the event of further proceedings in this matter.

Decrees affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/22/2023

IN THE MATTER OF THE ADOPTION OF: : IN THE COURT OF COMMON PLEAS
A.L.V. and A.J.R., : OF ERIE COUNTY, PENNSYLVANIA
Minors : ORPHANS' COURT DIVISION
APPEAL OF A.A.C., :
Mother : NO. 28 & 28A IN ADOPTION 2022

**F I L E D**

**OCT 2·7 2022**

**REGISTER OF WILLS**

## 1925(a) OPINION

On August 11, 2022, an order was entered terminating the parental rights of the natural mother, A.A.C. to her children A.L.V. and A.J.R. [1] The mother now challenges that order. A timely Notice of Appeal, and A Statement Pursuant to Pa. R.A.P. 1925 were filed by the A.A.C.'s counsel Emily M. Merski, Esquire. A review of the record supports the Court's determination that OCY presented sufficient clear and convincing evidence to terminate the mother's parental rights pursuant to 23 Pa. C.S.A. §§ 2511 (a)(1),(2) & (5), and is in the best interests of the children under 23 Pa. C.S.A.§ 2511(b). It is therefore requested the Superior Court affirm the order.

## PROCEDURAL HISTORY AND FACTS

A.L.V., born August , 2017 and A.J.R., born March , 2021 are the children of A.A.C., natural mother. The family had been living in New Jersey at a domestic violence shelter but were terminated and the mother with the children fled to Pennsylvania. On September 27, 2021, New Jersey Children's Services notified Erie County Office of Children and Youth ("OCY") about the mother traveling back and forth between New Jersey and Erie. New Jersey's involvement with the family included concerns about the mother's untreated mental health, drug and alcohol use, domestic violence and failure to meet the children's needs. *(7/14/2022 N.T. pp. 70-71).* OCY checked a motel where the family was residing. The mother and children were not there, but the

---

[1] The parental rights of the fathers of both children were terminated on August 11, 2022. Neither filed an appeal of that decision.

manager expressed concerns about the children being left alone. The family was tracked to a house on Ash Street in Erie, but once again were not there when OCY arrived. Finally, the mother, A.L.V., and a male were seen walking to a hotel room when they were confronted by OCY. A.J.R., 6 months old, was alone in the room. The mother claimed the male was her cousin from Ohio who was helping her. This turned out to be a lie as the male was identified as Luis Lopez, the mother's male companion. **Id., pp. 71-72.** The children were detained, and a Shelter Care Hearing was held on October 14, 2021. Upon being taken into custody, A.L.V. had scabies and was suffering from strep throat. A.J.R. also had scabies and a severe diaper rash. **Id., p. 75.** The children were ordered to remain in the custody of OCY, which filed a Dependency Petition the following day. An Adjudication Hearing was held on October 26, 2021. The mother did not attend, but was represented by counsel. The Juvenile Hearing Master recommended that the children be adjudicated dependent based upon the following allegations in the Dependency Petition, which was accepted by the Court, the Honorable Erin Connelly Marucci, on November 1, 2021:

1. (A.A.C.) had unstable housing. The Agency received a referral on September 27, 2021 that A.A.C. had been terminated from a domestic violence shelter in New Jersey and had fled to Pennsylvania. The Agency had been unable to make contact with A.A.C. until October 12, 2021, due to her transient nature. She had been staying in multiple motels and addresses since she arrived in Erie;

2. (A.A.C.) had not ensured the safety of the children. The staff at one of the motels voiced concerns about (the mother) leaving the children unattended and outside playing unsupervised. On October 12, 2021 when the Agency was able to locate (the mother), she was observed walking to a hotel room with an adult male and only one of the minor children. It was later learned that (the mother) left the other minor child in the room unattended while she was gone. There were no safe sleeping arrangements for the children and (A.A.C.) admitted to co-sleeping with the baby. Further, she was feeding the six-month old child inappropriate food. During this time (the mother) reported she had recently returned to New Jersey for a short time and was raped while in a caregiving role for the children;

3. (A.A.C.) had a history with New Jersey Children's Services. It was reported they had been attempting to work with (the mother) since March of 2021 for concerns regarding domestic violence, parental substance abuse, untreated mental health, ability to meet the children's needs and concerns regarding (A.A.C.) decision making skills. They report that her engagement had not been consistent;

4. The Agency had concerns regarding (the mother's) abuse of illicit drugs. During the removal, (A.A.C.) stated that she had recently smoked marijuana and had used "ice" recently. Further, (the mother) reported that she was diagnosed with ADHD and a learning disability and it was unknown if she was treated;

5. (A.A.C.) had not ensured the medical needs of the children had been met. The children's doctors in New Jersey reported that one of the minor children was behind on immunizations and had only been seen twice since birth;

6. It was unknown if (the father of A.J.R., and the father of A.L.V. were the biological fathers of their respective children). The Agency requested genetic testing to establish paternity; and

7. (The alleged fathers of both children) reside in New Jersey and New Jersey Children's Services reported that (both alleged fathers) had a history of domestic violence with (A.A.C.), substance abuse and mental health concerns.

**See Exhibit 8 pp. 11-12; Ex. 9 pp 11-12.**

A Dispositional Hearing immediately followed the Adjudication Hearing. The following permanency plan was recommended for the mother and was also accepted by the Court on November 1, 2021:

1. Submit to genetic testing to establish paternity;
2. Participate in an Agency approved, hands on parenting program and follow all recommendations;
3. Participate in mental health evaluation and follow all recommendations to include therapy and medication management if deemed therapeutically appropriate. (A.A.C.) will sign all necessary releases from the provider and this Agency in order for the Agency to obtain the evaluation and to verify services;
4. Participate in a drug and alcohol assessment through the Erie County Office of Drug and Alcohol and follow all recommendations. (A.A.C.) will sign a release of information with this provider in order for the Agency to obtain assessment;
5. Participate in domestic violence counseling and follow all recommendations. (A.A.C.) will sign all necessary releases from the provider and this Agency in order for the Agency to verify services and participation;
6. Refrain from the use of drugs and alcohol and participate in random urinalysis through the color code program at the Esper Treatment Center;
7. Obtain and/or maintain safe and secure housing to include residing with appropriate individuals, and provide the Agency with a signed lease; and
8. Obtain and/or maintain employment or another form of legal income in order to meet the needs of the children. (A.A.C.) will provide the Agency with verifiable proof of income.

**Ex. 8 pp. 18-19; ex. 9 pp. 18-19.**

The Court ordered that the children's permanent placement goal was return to the parent or guardian. A three (3) month review hearing was to be scheduled.

The initial Permanency Review Hearing was held on January 26, 2022. The mother was present represented by counsel. The Court found that there had been minimal compliance with the treatment plan, and minimal compliance in alleviating the circumstances which led to placement of the children. The Court ordered the following treatment plan:

1. Participate in an Agency approved, hands on parenting program and follow all recommendations until successfully completed;
2. Participate in a mental health evaluation and follow all recommendations to include therapy and medication management if deemed therapeutically appropriate;
3. Participate in a drug and alcohol assessment through the Erie County Office of Drug and Alcohol and follow all recommendations;
4. Participate in domestic violence counseling and follow all recommendations;
5. Refrain from the use of drugs and/or alcohol and submit to random urinalysis testing through the color code program at the Esper Treatment Center;
6. Secure and/or maintain safe and stabile housing, to include residing with appropriate individuals, and provide the Agency with a signed Lease Agreement;
7. Obtain an/or maintain gainful employment or another form of legal income and provide proof to the Agency;
8. Maintain weekly contact with the caseworker and attend any and all scheduled meetings in order to provide and receive updates; and
9. Sign all releases of information requested by the Agency.

**Ex. 8 p. 24; Ex. 9 p. 24.**

The children's permanency goal remained return to parent or guardian. A four (4) month review hearing was to be scheduled.

On February 25, 2022, the Honorable Erin Connelly Marucci issued an Order directing that the mother's visitation with the children would be contingent upon her being alcohol and drug free. If there was a positive urine test received, there was to be no visit until the next clean urine. Judge Connelly Marucci specifically noted that "the Court is not limiting the mother's visitation, just conditioning the visits on mother's sobriety. It is not in the children's best interest to have visits with mother while she repeatedly tests positive for Fentanyl" **Ex. 8 p. 26; Ex 9 p.26.**

The second Permanency Hearing was held on May 2, 2022. The mother was present represented by counsel. Judge Connelly Marucci found there had been no compliance by the

mother with the permanency plan. Further, the Court found there had been no progress by the mother toward alleviating the circumstances which necessitated the original placement of the children. The Court ordered the children's permanency placement goal be changed to Adoption. **Ex. 8 pp. 27-29; Ex 9 pp. 27-29.**

Rachel Lynch was the ongoing caseworker for the family and described the factors which led to the removal of the children and adjudication of dependency. *(7/14/22 N.T. pp. 68-75).* Ms. Lynch testified as to the mother's cooperation with the initial permanency plan ordered by the Court prior to the first Review Hearing on January 26, 2022 and described it as "minimal progress". *(7/14/22 N.T. p. 79).* Between October 2021 and January 2022, the Agency was unaware of the whereabouts of A.A.C., what she was doing, or with whom she was living. The mother was supposed to have Tuesday visits at the Agency beginning December 12, 2021 to find out what mother was doing to implement the treatment plan and what OCY could do to help her. A.A.C. missed the visits on December 12, 2021, December 28, 2021 and January 4, 2022. *(7/14/2022 N.T. pp. 80-82).* Mother made two visits before the review hearing and claimed something happened on January 4, 2022 prevented her from attending that visit. Going into the January 26, 2022 Review Hearing, the goal was still reunification of the children with the mother. *(7/14/22 N.T. p. 83).* Judge Connelly Marucci repeated the elements of the initial Treatment Plan. A.A.C. was to participate in a parenting program; mental health evaluation; undergo a drug and alcohol assessment; participate in domestic violence counseling; refrain from the use of drugs and alcohol and submit to random urinalysis; secure safe and stabile housing including residing with appropriate individuals; obtain gainful employment; maintain weekly contact with the caseworker; and sign all releases requested by the Agency.

A.A.C. unfortunately did not demonstrate any progress with her main issue – drug involvement – prior to the January 26, 2022 hearing. A.A.C. was given a urine test before the hearing and tested positive for Fentanyl. The mother insisted she did not use drugs. Mother's constant mantra to Ms. Lynch was "I'm not using drugs". (7/14/22 N.T. p. 79). A.A.C. insisted she tested positive for Fentanyl due to having sex with Luis Lopez and would get the drug through his semen. **Id., p. 94.**

A.A.C. was supposed to be doing random urine tests. The mother was a no show on December 9, 2021 and December 30, 2021and then had the positive test on January 26, 2022. On February 3, 2022 and February 7, 2022 mother tested positive for Fentanyl and was positive again on two occasions in April. Judge Connelly Marucci conditioned visits on mother having clean urines. As noted earlier, the Judge was concerned with the effect on the children of their mother being under the influence of Fentanyl at visits. Caseworker Lynch noted that the mother's last visit with the children was February 2, 2022 and no visits since that date. **Id., pp. 83-84, 94.**

Stabile housing and residing with appropriate people was part of the treatment plan. A.A.C. reported in January that she was living at 4210 Melrose Avenue in Erie. Exhibit 14 was copies of Incident Reports from the Erie Police Department regarding 4210 Melrose Avenue. From February 8, 2022 through March 21, 2022, the police were called ten times to that address. Among the descriptions of the incidents were knives and stabbings; baseball bat assaults; domestic violence, and thefts involving money and a cell phone. Ex. 14. A.A.C. went to the Erie Police on March 16, 2022 stating that someone was putting drugs in her air filter. This led to one of the police raids at 4210 Melrose Avenue, and drugs, money and weapons were seized as a result (*7/14/22 N.T. pp. 88-89*). It was determined that Luis Lopez was living at that address with A.A.C. Mr. Lopez was the male with mother when the children were removed in October, 2021 and had claimed to be the

mother': cousin Marceleno C. *(7/14/22 N.T. pp. 72-73).* Also living at the Melrose Avenue address was Jose Anibal Martinez a/k/a "Jersey" who was later indicted by the federal authorities on extensive drug charges. **Id., pp. 87.** The mother admitted to the caseworker on February 2, 2022 that she was running drugs back and forth between New Jersey and Erie for Martinez with the assistance of Luis Lopez, and said she was afraid. As part of that admission, mother stated the children were with her during these drug trips. **Id., pp. 87-89.**

An additional requirement of the treatment plan was for A.A.C. to complete a drug and alcohol evaluation. The mother completed that on March 25, 2022 but reported she did not use drugs at the assessment so no recommendations for treatment were made. **Id., p. 89.**

Mental health treatment was another part of the treatment plan, but the mother never followed through with that evaluation. **Id.**

The Court ordered A.A.C. to get involved with domestic violence treatment. This was never accomplished. The mother had a scheduled evaluation for February 22, 2022 for which she did not attend. That session was rescheduled but once again mother did not attend. As of April 29, 2022 the mother had done nothing regarding dealing with her exposure to domestic violence. **Id., pp. 89-90.**

A family reunification program was obviously key to a return of the children to the mother. Efforts were made to contact A.A.C. When an appointment was finally scheduled for April 26, 2022, the mother did not appear. She called and said she had a doctor's appointment that morning when her family reunification program was supposed to take place. She asked to reschedule the appointment for the afternoon. The appointment was rescheduled but A.A.C. failed to show. **Id.**

One potentially positive result was that the mother did go to a safe shelter on April 6, 2022, but left on April 21, 2022, because she did not follow the shelter's rules. On April 26, 2022 mother

called and asked to come back, but then did not return phone calls to set up a safe shelter again. **Id. pp. 90-91.** Previously, Rachel Lynch tried to get A.A.C. into a safe shelter in February 2022 and mother called her to say she was at the shelter, but that turned out to be a lie. **Id., p. 92.**

Ms. Lynch stated that A.A.C., the mother, did not comply with any part of the treatment plan from the initial Dispositional Order on November 1, 2021 through the second Permanency Review Hearing on May 2, 2022. **Id., p. 90.** During this entire period, A.A.C. never admitted to drug use or having a drug problem. **Id., pp. 103, 126.**

Patricia Potter is Executive Director and Outpatient Therapist at Affinity Family Support Services. That Agency provides therapy for those with mental health disorders and specializes in treating traumatized children who live in kinship homes, foster homes, pre-adoptive and adoptive homes. Ms. Potter has over 25 years' experience in this field, 10-12 years with Affinity. **Id., pp. 13-14.** A.L.V., four years old, was referred to Affinity by Erie County Care Management, and an assessment was performed in November 2021. A.L.V. was having difficulties in foster homes and was in her fourth placement when Ms. Potter saw her. Ms. Potter had worked with children as young as two and a half years old and found that the earlier treatment began, the better the outcome. **Id., pp. 14–15.**

The behaviors the child exhibited included aggression, pinching, hitting, tantrums, destruction of other children's property, stealing and night terrors. The therapist was seeing A.L.V. on a weekly basis and worked with both the child and foster mother on self-regulating techniques used for traumatized children. Those techniques have the purpose of calming a child down. Ms. Potter, at the time of the July 14, 2022 Termination proceeding, was continuing to work with the child and foster mother on a weekly basis. **Id. pp. 15-17.** Potter prepared a report dated April 10,

2022 for the Juvenile Court that was admitted as Exhibit 17 in the Termination Hearing. **Id., pp. 18-19.**

A.L.V. described numerous episodes in her life. Ms. Potter noted that what A.L.V. recounted was not necessarily totally accurate, but indicated the child experienced something in life that manifests itself as trauma. The trauma memories expressed were from the child's time living with the mother. The child had consistent memories of being in a car with mother with drugs and a gun. Other memories involved domestic violence and being fearful for the safety of mother and child. A.L.V. would express these memories freely. The free expression of these memories would open up more memories. A.L.V. revealed exposure to guns and a robbery. The child recalled being in a hotel room where there were drugs and the police came. A.L.V. stated she did not have a shirt on and the police found her a "Paw Patrol" shirt and put it on her. Another recalled memory was of the mother being duct-taped and put in the trunk of a car. A.L.V. said she was afraid her mother was going to be killed along with her and her baby sibling. Recently the child demonstrated sexualized behaviors in the foster home. **Id., pp. 20-25.**

Visitation with the mother stopped in February 2022. Ms. Potter testified that without that visitation the child became more regulated in the foster home, and the night terrors stopped after a few weeks. A.L.V. was no longer fearful someone would come and kill her. **Id., p. 26.**

Although the foster home was not an adoptive home, the foster mother was committed to treatment for A.L.V. Potter stated that once a child feels safe and secure, the child can go to other loving adults. Potter described treatment as not a cure, but a continuous process to develop healthy relationships continuing over time as developmental levels of the child changed. A child needs permanency and enjoying a family is in A.L.V.'s best interest. **Id., pp. 27-29, 60.**

Rachel Lynch provided additional testimony concerning A.L.V. and A.J.R. The two children are very attached to each other. A.J.R. was 6 months old when the children were removed from the mother's care and turned one on March 25, 2022. Id., **pp. 93-94.** Lynch related that A.L.V.'s trauma resulted in the child being diagnosed with PTSD and RAD-Reactive Attachment Disorder. Mental health treatment began with A.L.V. as quickly as possible after placement as that was seen as an urgent need for A.L.V. Lynch noted that the child continues in therapy and has improved to such an extent as to become "a completely different kid". **Id., pp. 95-97.**

CCY is actively seeking a "forever home" for the two children who are viewed as a unit for that placement. The current foster parents, although not an adoptive resource, are committed to a transition to a forever home. That family would need to be loving yet firm, and be fully aware of A.L.V 's diagnoses of PTSD and RAD, as the child will test limits. **Id., pp. 97-99.** The Agency is pursuing a child specific recruitment process for A.L.V. and A.J.R. as was described by Ms. Lynch. Id., **p. 122.**

Rachel Lynch opined that there would be no detriment to either child were the Court to sever the mother's parental rights. Lynch saw no benefit but rather harm A.L.V. in continuing a relationship with mother. A.A.C.'s admitted involvement in the drug trade and her fears in that regard consumed her life which created a barrier to the implementation of the treatment plan with the mother. Ms. Lynch exhausted all reasonable efforts with the mother in attempting to alleviate the circumstances which led to the children's placement. **Id., pp. 101-102.**

A.A.C. was called as a witness as on cross by the Agency. She revealed that as of about July 7, 2022 she was residing at Bergen New Bridge Medical Center Treatment Facility in New Jersey. The mother stated she was now living in New Jersey. On June 26, 2022 she and Luis Lopez were arrested on shoplifting charges in Kearny, New Jersey. Id., **pp. 5-7, See Ex. 15, 16.** Lopez

had crack pipes and syringes on him when he was arrested, and A.A.C. admitted to using drugs on June 26th. **Id., pp. 9-11.** The mother testified that the last day she used drugs was "last Thursday", the day she entered the treatment facility.

At the Review Hearing before Judge Connelly Marucci on May 2, 2022, A.A.C. denied, under oath, that she had a drug problem. At the Termination Hearing, she stated she went into treatment because she was an addict. **Id., p. 8.** A.A.C. agreed that she did nothing she told Judge Connelly Marucci she would do at May 2nd Hearing. **Id., p. 11.**

A.A.C. later testified that she is an addict, wanted help and was willing to change. The mother stated she put herself in difficult situations and picked Luis Lopez over her children. **Id., pp. 128-133.**

A Hearing were held on the Agency's Petitions to Terminate the Parental Rights of A.A.C. to A.L.V. and A.J.R. on July 14, 2022. This Court reviewed the testimony and evidence presented at the Involuntary Termination Hearing and issued Orders on August 11, 2022. The Agency presented sufficient clear and convincing evidence justifying the termination of the parental rights of A.A.C. to A.L.V. and A.J.R. pursuant to 23 Pa. C.S. §§ 2511 (a)(1),(2),(5) and (8), and that termination is in the best interest of those children under 23 Pa. C.S. § 2511 (b).

## ISSUES PRESENTED

1. The Orphan's Court committed an abuse of discretion and/or error of law when it concluded that the Agency had established, by clear and convincing evidence, the grounds for termination pursuant to 23 Pa. C.S.A. § 2511 (a)(1) that the natural mother has evidenced a settled purpose of relinquishing a parental claim to the minor child or has refused or failed to perform parental duties.

2. The Orphans' Court committed an abuse of discretion and/or error of law when it concluded that the Agency had established, by clear and convincing evidence, the grounds for termination pursuant to 23 Pa. C.S.A. § 2511 (a)(2). Specifically, the Orphan's Court did not give due consideration to the fact that the natural mother has not displayed a repeated incapacity, abuse, neglect, or refusal to remedy the conditions that necessitated placement.

3. The Orphan's Court committed an abuse of discretion and/or error of law when it concluded that the Agency has established, by clear and convincing evidence, the grounds for termination pursuant to 23 Pa. C.S.A. § 2511 (a)(5). Specifically, the Orphan's Court did not give due consideration to the significant progress on the part of the natural mother in remedying the conditions which led to the removal or placement of the child and make a determination as to whether those concerns continued to exist and whether termination of parental rights would best serve the needs and welfare of the child.

4. The Orphan's Court committed an abuse of discretion and/or error of law when it concluded that the Agency had established, by clear and convincing evidence, the grounds for termination pursuant to 23 Pa. C.S.A. § 2511(b). Specifically, the Orphan's Court did not consider the trauma and impact that befalls a child upon severing the clearly established bond between natural mother and the minor child and how permanently severing that bond was in the best interest of the minor child.

## STANDARD OF REVIEW

In reviewing an appeal from an order terminating parental rights,

Appellate courts must apply an abuse of discretion standard when considering a trial courts determination of a petition for parental rights. [The] standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (2010).*

If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.* An abuse of discretion does not result merely because the reviewing court might have reached a conclusion. *Id.* Instead, a decision may be reversed for an abuse of discretion only upon determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

## DISCUSSION

In a termination of parental rights hearing, the initial focus is on the conduct of the parent. The party moving for termination must "prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007).* Once these statutory grounds exist, the court may analyze whether it is in the best interests of the child for parental rights to be terminated. *Id.*

The Agency proceeded to seek termination under the following grounds of Section 2511:

(a)(1) the parent by conduct which has continued for a period of at least six (6) months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to the child, or has refused or failed to perform parental duties;

(a)(2) the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for the physical or mental well-being of said child and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent;

(a)(5) the child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency for a period of at least six (6) months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child;

(b) The termination of parental rights of A.A.C. to A.L.V. and A.J.R. is in the best interest of the children.

One major aspect of this analysis includes the "nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *Id.* The Superior Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of 23 Pa. C.S.A. §2511(a). *In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), app. den. 863 A.2d 1141 (2004).*

Preserving Appellant's parental rights is not an acceptable option in this case. "Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re B.N.M., 856 A.2d, 847, 855 (Pa. Super. 2004).* "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.*

A.A.C. refused to address any of the issues that led to her children's removal. OCY put together a comprehensive plan to put A.A.C. in a position to have the children returned to her and be raised in a safe environment. Parenting, domestic violence treatment and mental health therapy were all components to help A.A.C. put her life in order. She did not attend any of these throughout her involvement with the Agency, or if she did attend an evaluation, claimed to have no problems. Referrals to safe housing were made to protect her from the drug trafficking life in which she was immersed, yet these efforts went for naught. A.A.C. lied about entering safe housing. Even when she appeared to accept that protection, the mother left because she could not or would not follow the rules.

The main culprit in A.A.C.'s parenting failure was her drug use. Programs offered to wean her off that lifestyle were ignored by the mother. A.A.C. continually denied drug involvement. On the infrequent occasions when she subjected herself to the court-ordered urinalysis, she tested positive for Fentanyl. Her excuse was always the same – "I don't do drugs". The mother expected the authorities to believe her positive tests for Fentanyl were because of having sex with Luis Lopez with the drug being passed through his semen. A.A.C. tested positive for Fentanyl the day of the first Review Hearing on January 26, 2022. Same excuse. Even when the Court conditioned the mother's visits with her children on drug free urine test to prevent their exposure to a mother on Fentanyl, A.A.C. continued to fail. This continuing failure on the mother's part led to the canceling of visitation from February 2, 2022 onward. Even this drastic step by the Court could not shake A.A.C.'s refusal to cooperate with the programs designed to reunite her with her children.

A.L.V. was particularly traumatized by the mother's failure to provide the most essential element of parenting – protection of children. A.A.C. admitted to having both A.L.V. and A.J.R. with her during drug runs between New Jersey and Erie. A.L.V. recounted drugs, guns, violence against the mother and police intervention. The child feared for her safety as well as her mother's. A.L.V. recounted police coming to their hotel room and she had no shirt on. The child remembered the name of the shirt the police put on her – Paw Patrol. Devastating specific memories of a 4 year-old. These traumas have led to problematic behaviors by A.L.V. which are being addressed through therapy. Patricia Potter, the child's therapist, noted that dealing with the trauma in A.L.V.'s life will be an ongoing concern throughout A.L.V.'s life. A.L.V. and A.J.R. have a strong attachment and will be adopted as a unit. The foster mother has been actively involved in A.L.V's

therapy and will maintain that level of commitment through working with an adoptive family to successfully transition the children.

A.A.C. was served verbal notice of the scheduling of the Termination Hearing on May 13, 2022. See Ex. 1. Prior to the hearing, A.A.C. moved to New Jersey with Luis Lopez; was arrested with him for shoplifting while admittedly on drugs; and entered a treatment facility around July 7, 2022. A.A.C. now declares she is a drug addict and wants a second chance to be a mother. The adage, "actions speak louder than words", obviously applies here. It is difficult to fathom how A.A.C. wants to be as mother to her children when she moved to New Jersey. The recent admission of being a drug addict supports the conclusion that A.A.C. was lying to the Agency, drug treatment centers, and the Court, in claiming she did not do drugs. The level to which the mother was willing sink to try to dupe authorities is borne out by the fact she expected professionals to believe she was testing positive for Fentanyl because of sex with her boyfriend.

As previously noted, the standard of review of a trial court's determination to grant an involuntary termination of parental rights is abuse of discretion.

The Supreme Court has stated:

> "[W]e must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan."

*In re R.J.T. 608 Pa. at 27, 9 A.3d at 1190.*

A.A.C. has no credibility when she claims she is now attempting to straighten out her life. Her actions throughout the Agency's involvement and New Jersey Children's Service involvement before that evidence a woman who has no desire to act as a parent. As A.A.C. testified on July 14, she placed others before her children. Her actions corroborate that she has and will continue to subvert her children's well-being for her own desires.

This Court has noted the standard of review governing termination of parental rights' case. Under 23 Pa. C.S.A. §2511(b), no efforts by the parent after the date of notice of the filing of the Termination Petition will be considered pursuant to cases under subsection (a)(1). Subsection (a) (1) is one of the subsections being pursued by the Agency. Termination can be affirmed if one of the subsections is supported by clear and convincing evidence. **In re BLW, supra.**

The mother has clearly shown that she has no desire to change her attitude or actions toward parenting, no matter how much at risk it places her children. A.A.C. rejected all services and efforts during the course of the Agency's involvement, and termination of her parental rights under subsection (a)(1) is appropriate.

The Agency is also proceeding under subsections (a)(2) and (a)(5). Although this Court believes sufficient evidence supports termination under subsection (a)(1), there is clear and convincing evidence supporting termination under both those subsections as well. Counsel for the mother alleges that the Court did not consider that the mother has not demonstrated the continued incapacity neglect or refusal to remedy the conditions which led to the children's placement. Further, Counsel states the Court did not adequately consider the mother's efforts to remedy those conditions, the evidence prove otherwise. A.A.C. continued to use drugs until July 7, 2022. She moved to New Jersey with her boyfriend sometime in June 2022; was arrested with him while she was under the influence of Fentanyl on June 26, 2022. Only July 14, 2022 she admitted she was an addict to this Court and proclaimed she had been clean for a week. These facts utterly fail to demonstrate that A.A.C. has made any effort to remedy the conditions which led to her children's placement. The mother's claim that being clean for a week since being in treatment fails to provide convincing evidence of her efforts to remedy those conditions. A.A.C. lied about drug use and minimized issues in her life. She couldn't bring herself to be off drugs in order to visit her children.

One week sober and in treatment, with criminal charges pending, does not provide this Court with sufficient credible evidence that A.A.C.'s efforts are genuine.

Finally, Counsel for the mother states that repercussions of severing the bond between A.A.C. and her children have not been sufficiently considered by this Court. Again the evidence demonstrates otherwise. A.L.V.'s destructive behaviors minimized once visits with her mother stopped. The child no longer had night terrors or was fearful someone would come to the foster home and steal her. Therapy to work through the traumatic events of A.L.V.'s life are ongoing and have shown promise. Subjecting a child to drugs, guns, violence, fear for safety and being left alone are not factors which would lead a child to have a strong positive relationship with a parent. A.J.R. was too young to understand what the exposure to these events constituted. However, she is attached to A.L.V. and will be adopted along with A.L.V. into the same loving adoptive family.

The evidence demonstrated that severing contact with their mother has not had any detrimental effect on the children. Not permitting these children to have to face the continued lifelong trauma and instability they have been through in their short lives is of paramount concern to this court.

A.A.C. has continuously demonstrated she cannot or will not place her children's needs above her own. She refuses to accept responsibility for her actions. The skills and judgment necessary to provide for the emotional well-being of her children are non-existent. The total history of this case reveals that the mother is unable and unwilling to change or to give priority to the needs for safety and adequate care for her children. She was given numerous opportunities to demonstrate she would work to be able to provide the necessary basic needs for her children and consistently failed to do so. The Agency has provided clear and convincing evidence supporting the Termination of A.A.C's parental rights to A.L.V. and A.J.R. pursuant to 23 Pa. C.S.A. §2511(a)

(1), (2), and (5), and that termination is in the best interest of those children. 23 Pa. C.S.A. §2511(b).

## CONCLUSION

The mother A.A.C. has absolutely refused to accept any services and programs offered to her to remedy the conditions which led to the removal and placement of A.L.V. and A.J.R. The mother has shown that she cannot or will not remedy the conditions which led to the removal of her children. A.A.C. did not evidence any desire or ability to place her children's safety and well-being above her dangerous lifestyle. There is no parental bond between mother and children. The best interests of A.L.V. and A.J.R. are best served by termination. It is requested that the Superior Court affirm this Court's Decree terminating the Appellant/mother's parental rights.

Dated this 27th day of October, 2022.

BY THE COURT:

Shad Connelly, Senior Judge

cc:    Amy E. Jones, Solicitor, Office of Children and Youth, 154 West Ninth Street, Erie, PA 16501
Steven E. George, Esquire, 300 State Street, Suite 300, Erie, PA    16507
Emily M. Merski, Esquire, 3820 Liberty Street, Erie, PA    16509