J-A18022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.Z., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: D.Z., MOTHER : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | No. 112 WDA 2023 |

Appeal from the Decree Entered December 27, 2022
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s):  No 32 -22-0329

| | |
|---|---|
| IN THE INTEREST OF: C.Z. A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: D.Z., MOTHER : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | No. 113 WDA 2023 |

Appeal from the Decree Entered December 27, 2022
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s):  32-22-0331

| | |
|---|---|
| IN THE INTEREST OF: J.Z., A MINOR : | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| : | |
| APPEAL OF: D.Z., MOTHER : | |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | No. 114 WDA 2023 |

Appeal from the Decree Entered December 27, 2022
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s):  32-22-0731

BEFORE:  BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

J-A18022-23

MEMORANDUM BY LAZARUS, J.:          **FILED: September 15, 2023**

D.Z.[1] (Mother) appeals from the decrees,[2] entered in the Court of Common Pleas of Indiana County, Orphans' Court Division, involuntarily terminating her parental rights to her three minor children, L.Z. (born 9/11), J.Z. (born 11/12), and C.Z. (born 2/14) (collectively, Children). After careful review, we affirm.

Mother and Father have five adopted minor children. In 2019, a Child Protective Services (CPS) report alleged that Mother was abusing Children by withholding food from them. Shortly thereafter, Indiana County Children and Youth Services (CYS) received another CPS report; this time, the report alleged that the parties' oldest child, A.Z., was being sexually abused by Father and that A.Z. was concerned she might be pregnant.[3] According to CYS, Mother minimized Father's behaviors, often stating that A.Z. is "manipulative and implying that she may be making up these allegations." Menta Psychological Evaluation, 3/26/20, at 2. By way of example, Mother's

---

[1] Mother has remarried and her initials are now D.A.

[2] On February 14, 2023, our Court *sua sponte* consolidated Mother's three separate appeals docketed at 112, 113 and 114 WDA 2023. **See** Pa.R.A.P. 513.

[3] Following CYS and police investigations, Father, who is not a party to this appeal, was charged with ten counts of sexually-related offenses (including statutory sexual assault, rape, and involuntary deviate sexual intercourse) with regard to the alleged sexual abuse of A.Z. An aggravated circumstances order was entered against Father in August 2020. No reunification efforts were to be provided with regard to Children and Father.

minimizing actions included not permitting A.Z. to testify at Father's preliminary hearing, despite A.Z. being present for the hearing and refusing to let A.Z. talk to victim advocates. Additionally, Mother stated that she was going to reunite with Father when he was released from prison.

A September 2019 CYS report alleged that one of the parties' other children, B.Z., was inserting his fingers in J.Z.'s anus. After an investigation into the allegation, a referral for mental health counseling was made. In January 2020, it was alleged that there was more sexual contact among the parties' children in the family home. Accordingly, CYS implemented a safety plan that permitted the children to remain in the family residence, but prohibited them from sleeping in bed with one another. Despite this plan, Mother refused to permit any CYS caseworkers or service providers into the house[4] from March to June of 2020 and permitted Children to sleep together in Mother's bed.

In July 2020, there was another report of child sexual abuse in the home; the report listed both parents as perpetrators. Specifically, the report alleged that Mother was aware of the sexual abuse in the home but failed to report it within the mandated timeframe. Following a shelter care hearing,[5]

_____

[4] Although Mother alleged that she did not allow the caseworkers and service providers into the house because of the COVID-19 pandemic, she did travel to Lancaster County during this same time period.

[5] Specifically, CYS' shelter care application alleged that Mother knew about Father's assaults but "fail[ed] to take action to protect [Child]." Shelter Care
*(Footnote Continued Next Page)*

- 3 -

CYS was granted emergency protective custody of Children due to the reports of sexual abuse in the home and Mother's unwillingness to provide Children with proper supervision and inability to understand the trauma Children had been going through. Children were placed in a foster home.[6] On August 6, 2020, Children were adjudicated dependent.

Mother was granted bi-weekly supervised visits with Children; however, the frequency was increased to weekly visits. While Mother consistently attended visits, her visits never progressed to unsupervised.

Permanency review hearings were held in November of 2020, February, July, and October of 2021, and April and October of 2022. On April 14, 2022, CYS filed petitions to involuntarily terminate Mother's parental rights to Children[7] pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act.[8] The Orphans' Court held three days of termination hearings in August and October of 2022. Clinical psychologist, Carolyn J. Menta, Psy.D.,

_____

Application, 7/22/20, at 1. The application also averred that "[M]other does not believe the allegations regarding Child's older sibling or the reports related to the other inappropriate contact[,] seems unable to understand the trauma the children went through with these incidents[, and] continues to allege that Child and his siblings are lying about the allegations." *Id.* at 2.

[6] Mother also allegedly told the other children to keep secrets.

[7] CYS also filed a petition to involuntarily terminate Father's parental rights to Children. Father testified on his own behalf at the termination hearings. The court ultimately terminated Father's rights to Children. He is not party to this appeal.

[8] *See* 23 Pa.C.S.A. §§ 2101-2938.

forensic psychologist, Jonathan M. Gransee, Psy.D., Alternative Community Engagement Solutions, LLC (ACES) licensed clinical social workers, Dawn Smitely and Tracie Pletcher, ACES supervised visitation specialist, Mattie Hannak, and CYS caseworkers, Rachel McGregor and Tori Hanig, testified at the hearings on behalf of CYS. Mother, Mother's current husband, Mother's former stepdaughter and her husband, and Mother's sister-in-law testified on Mother's behalf at the hearings.

On December 27, 2022, the court entered decrees terminating Mother's parental rights to Children under subsections 2511(a)(8)[9] and (b). Mother filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). Mother presents the following issue for our review: "Whether the [t]rial [c]ourt erred in terminating [Mother's] parental rights to the subject children,

---

[9] Section 2511(b)(8) permits involuntary termination of parental rights where:

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8). "Termination under [subs]ection 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citations omitted).

because the Agency failed to meet its burden by clear and convincing evidence." Mother's Brief, at 3.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under section 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in section 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Mother generally alleges that CYS did not meet its burden of proof to warrant termination of her parental rights and "respectfully refer[s] this Court to the evidence and testimony at three hearings on this matter [where s]aid testimony demonstrates that [Mother] did not fail in her parental duties to the

- 6 -

subject children and[,] in fact, [shows that she] was compliant with the many requests and recommendations made to her by [CYS]." Mother's Brief, at 10.

With regard to Mother complying with her service goals, Mother points to Dr. Menta's testimony that Mother "*did* follow her recommendation that she attend trauma therapy." Mother's Brief, at 15 (emphasis in original). At the time of the October 2022 termination hearing, Caseworker Hanig testified that Mother was participating in weekly telehealth therapy sessions and "has made progress" according to her therapist. N.T. Termination Hearing, 10/13/22, at 26. However, Hanig also testified that after Mother completed her third parenting capacity evaluation, more than one year after the first evaluation, Mother has still not made any real progress. *Id.* at 27. Hanig stated, "despite [Mother's] participation in services and compliance with those requests, as we are here over two years after the dependency was granted, [CYS] still does not believe she has made progress in addressing the concerns that existed at the time of placement." *Id.* *See id.* at 43 (Hanig testifying none of CYS experts stated Mother made progress in services); *id.* at 53 (Doctor Menta testifying on re-direct examination she did not see any significant change in Mother to suggest Mother solved problems leading to Children's placement two years earlier).

Mother also cites to Dr. Gransee's parenting capacity assessment that acknowledged that Mother "had put[] cameras in the house[,] obtained a new residence where [she] strategically planned out where everybody was going to be sleeping to increase safety and improve boundaries[,] has gone to

therapy[,] attended visits[, and has] done a lot of the things that need to be done in order to say [she] checked this box." Mother's Brief at 16, citing N.T. Termination Hearing, 8/30/22, at 74. Despite these observations, Dr. Gransee concluded his assessment by saying, "It's just more about [Mother's] attitude or investment or the [lack of] depth of [her] understanding [as to] what went wrong and what [Mother] needs to [do] to fix it." N.T. Termination Hearing, 8/30/22, at 74. When pressed to clarify his professional judgment regarding Mother's compliance and progress, Dr. Gransee testified that Mother's reluctance to change her attitude and resolve the serious issues involving her family "indicate[s] that her basic beliefs haven't changed."[10] *Id.* at 75.

Under such circumstances, we conclude that the Orphans' Court properly terminated Mother's parental rights under subsection 2511(a)(8), where clear and convincing evidence demonstrates that: (1) Children were removed from Mother's care for almost 28 months at the time of the termination hearings; (2) the conditions (lack of empathy and parental insight/minimizing concerns about household child abuse perpetrated by Father/impact of abuse on Children) that led to Children's placement still exist; and (3) termination of Mother's parental rights best serves Children's needs

---

[10] Mother reportedly told Dr. Gransee in a re-assessment that she had suffered from a history of abuse at the hands of Father. Mother reported that she was afraid that Father would kill her if she reported the child abuse in the home. However, Mother also admitted that she encouraged Father to shower with B.Z., to expedite the bedtime routine. Finally, Dr. Gransee felt that Mother had "given up on all of the children, except B.Z." N.T. Termination Hearing, 8/30/23, at 71.

and welfare. As previously stated, several experts concluded that after more than two years of placement there were still significant concerns regarding Mother's parenting capacity, in particular her ability to provide protection and safety for Children. Succinctly put by Dr. Menta, Mother's "lack of empathy [and] insight in a situation like this is concerning because there is a lack of support for the child[,] but also a lack of protection for the child. [A] lack of empathy coming from their primary support person basically invalidates their experience and retraumatizes the child." N.T. Termination Hearing, 8/30/22, at 19. *See In re I.J.*, 972 A.2d 5 (Pa. Super. 2009) (even where parents made "significant strides toward remedying conditions that had led to the[ir] [c]hild's removal," where record "unambiguously reflect[ed] that all of the conditions have not been remedied and that reunification between [child] and parents remains untenable after nearly two years of foster care," termination appropriate under subsection 2511(a)(8)).

In her brief, Mother also contends that the evidence at the termination hearings showed that CYS did not prove, by clear and convincing evidence, that termination would "serve the needs and welfare of the [C]hild[ren]" in light of the parent-child emotional bonds. Mother cites to Dr. Menta's psychological/parental capacity/bonding evaluation that acknowledged "[C]hildren showed love and affection" to Mother during evaluations. *Id.* at 14-15.

Instantly, Caseworker Hanig testified that Mother's supervised visits with Children "go relatively well" and that "[t]he [C]hildren enjoy being there

and seeing each other and seeing their mom." N.T. Termination Hearing, 10/13/22, at 29. However,

> [w]hile a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> [I]n addition to a bond examination, the [Orphans'] Court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent[.]

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and quotations omitted). Moreover, when evaluating the parent-child bond, evidence of a parent's abuse and neglect is a relevant component of the analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics[,] as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent[.] . . . Nor are we of the opinion that the biological connection [among the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish [that] a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and citations omitted).

- 10 -

Notably, in its Rule 1925(a) opinion, the Orphans' Court judge stated that "Mother's persistent and profound lack of insight and empathy in matters involving the children," as per the experts' testimony and reports, "are at the core of the [c]ourt's decision on this matter." Orphans' Court Opinion, 12/27/22, at 9. Moreover, Caseworker Hanig testified that it would be in the best interests of Children to grant parental termination because there were still "significant concerns with [Mother's] ability to keep the children safe[,]" especially where Children are stable and thriving in their current pre-adoptive foster homes. N.T. Termination Hearing, 10/13/22, at 24-25. Elaborating on her concerns with regard to Mother being reunified with Children, Hanig testified:

> There [are] significant concerns with her ability to supervise the [C]hildren appropriately. There's significant concern with her lack of empathy. And there's significant concern, noted in both Dr. Gransee's and Dr. Menta's evaluations, with returning the [C]hildren.
>
> * * *
>
> [Mother is] not taking responsibility for any of her actions. For example, she told Dr. Menta during the bonding assessment that she had the perfect family until A[.Z.] came and ruined it. So she's still blaming the first child for all of this happening.
>
> * * *
>
> [Although Mother is] doing what we're asking because she's court-ordered [to do that,] . . . she's not making any changes in her thinking and her actions. They'[re] no changes.

*Id.* at 37-38.

After careful review, we conclude that the record supports the Orphans' Court's conclusion that termination of Mother's parental rights satisfies Children's needs and welfare. **See** 23 Pa.C.S.A. § 2511(b). Children are thriving in their pre-adoptive foster homes.[11] Moreover, each of the experts testified and reported that Mother's failure to affirmatively take responsibility for her part in the abuse that occurred in the home, even in a passive role, prevents her from being able to properly parent Children, which intrinsically includes providing a healthy and safe environment for them. **In re Adoption of C.D.R., supra**.

Because the Orphans' Court's decision is supported by competent evidence, we conclude that it did not abuse its discretion in involuntarily terminating Mother's parental rights under subsections 2511(a)(8) and (b). **In re A.R.**, **supra**.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2023

---

[11] Caseworker Hanig also testified that if termination were granted, Children would still be able to have contact with one another. N.T. Termination Hearing, 10/13/22, at 24, 33.

- 12 -