J-S41043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.J.C.J.-W. A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.W., FATHER | : : : : : : : | |
| | : | No. 2164 EDA 2025 |

Appeal from the Decree Entered July 18, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000305-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.-M.J.-W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.W., FATHER | : : : : : : : | |
| | : | No. 2166 EDA 2025 |

Appeal from the Decree Entered July 18, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000306-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: I.D.Z.-M.J.-W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.W., FATHER | : : : : : : : | |
| | : | No. 2168 EDA 2025 |

Appeal from the Decree Entered July 18, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000304-2025

J-S41043-25

BEFORE:   BOWES, J., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED DECEMBER 12, 2025**

A.W. (Father) appeals[1] from the decrees, entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, granting the petitions filed by the Philadelphia Department of Human Services (DHS), which sought to involuntarily terminate Father's parental rights to his biological children, N.J.C.J.-W., aka C.J.-W., (born 12/2009), T.A.-M.J.-W., aka T.J.-W., (born 9/2012), and I.D.Z.-M.J.-W., aka I.J.-W., (born 3/2014), (collectively, Children), pursuant to Subsections 2511(a)(1), (2), (5), (8), and Section 2511(b) of the Adoption Act.[2]  **See** 23 Pa.C.S. §§ 2101-2938.  After careful review, we affirm.

The relevant and applicable facts of this case are as follows.  The court ordered supervision of Children in January 2024, after DHS became involved with the family due to concerns regarding C.J.-W.'s school attendance, the cluttered condition of Father's home, and reports of Father's drug and alcohol abuse, including marijuana and fentanyl use, and reports of abuse, neglect, and lack of resources (indigence) in the family home.  **See** N.T. Termination Hearing, 7/17/25, at 27, 48-49.  Tabor Children's Services (TCS) was

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On September 8, 2025, our Court *sua sponte* consolidated Father's appeals at 2164 EDA 2025, 2166 EDA 2025, and 2168 EDA 2025.  **See** Pa.R.A.P. 513.

[2] Tragically, Children's biological mother (Mother) passed away in 2016.  **See** N.T. Termination Hearing, 7/17/25, at 30.

appointed to be the relevant community umbrella agency (CUA) to administer services on behalf of DHS for the family.

CUA caseworker Gardy Saint Jean testified that, during the life of the case, Father's goals did not change, **see** N.T. Termination Hearing, 7/17/25, at 14, which goals were to: (1) comply with TCS programs and services[3]; (2) participate in evaluations for mental health and drug and alcohol services through Greater Philadelphia Asian Social Services[4]; (3) ensure bills are paid[5]; (4) complete a financial literacy class[6]; (5) complete a parenting class[7]; (6)

_____

[3] Caseworker Saint Jean testified that Father deliberately ignored all goals in favor of family therapy because Father stated that he felt it was the only way, or the most important way, to reunify the family. **See** N.T. Termination Hearing, 7/17/25, at 52-53.

[4] Father tested positive for marijuana and/or cocaine use three times and was discharged for non-compliance as recently as May 2025. **See** N.T. Termination Hearing, 7/17/25, at 17, 56. Also, Father checked himself into inpatient drug treatment programming twice but could not provide documentation of successful program completion. **See id.** at 19, 57. Further, Father failed to attend three court-ordered random and one "forthwith" drug screens and was not always acknowledging his drug use. **See id.** at 19-20.

[5] Father paid the bills with Mother's death benefits. **See** N.T. Termination Hearing, 7/17/25, at 12-13.

[6] Father provided a certificate of completion through the Arc of Philadelphia. **See** N.T. Termination Hearing, 7/17/25, at 21.

[7] Father did not complete a parenting class. **See** N.T. Termination Hearing, 7/17/25, at 21-22.

declutter the family home[8]; (7) explore housing resources[9]; and (8) obtain employment[10]. *See id.* at 12.

Once adjudicated dependent, after Children were placed with resource families, Father initially had unsupervised liberal visitation with C.J.-W., until C.J.-W. expressed a desire to discontinue visits with Father because of a fight between them and because Father held C.J.-W. out of a window and bruised C.J.-W. *See id.* at 22-24. Further, C.J.-W. stated to Caseworker Saint Jean that Father brought C.J.-W. on car rides that they "shouldn't have gone on,"

_____

[8] Caseworker Saint Jean testified that the home was in "deplorable" condition. N.T. Termination Hearing, 7/17/25, at 13. Specifically, Caseworker Saint Jean observed:

> [l]arge insects, a lot of clutter, animal feces, children with indigent, unclean, clothes are dirty [sic]. Their rooms were bad. [. . . T.J.-W.] told me that she used [an] insect killer[ that was in T.J.-W. and I.J.-W.'s room,] which I thought was inappropriate.
>
> The room was very dirty. The walls were dirty. There were bugs on the walls. They had a rabbit at a time. The feces was up to the top of the cage[,] it seemed like.

*Id.* Further, Caseworker Saint Jean testified that, at some point, the home was decluttered, but it was re-cluttered soon thereafter. *See id.* at 15.

[9] Father provided a certificate of completion through the Arc of Philadelphia. *See* N.T. Termination Hearing, 7/17/25, at 21.

[10] Caseworker Saint Jean testified that Father had no employment because Father did not provide documentary proof of his employment. *See* N.T. Termination Hearing, 7/17/25, at 12. At the termination hearing, Father testified that he worked several jobs, including as a part-owner of a newsstand and at a "temp service" agency. *See id.* at 66-67.

and C.J.-W. witnessed things like Father dealing drugs from the family home.[11] *Id.* at 25. C.J.-W. declined the opportunity to engage with Father in family therapy every time Caseworker Saint Jean offered it. *See id.* at 36. Further, C.J.-W. stated multiple times that life was improved without Father. *See id.* at 26.

At the termination hearing, Caseworker Saint Jean testified that C.J.-W. shared a very close bond with C.J.-W.'s resource parent. *See id.* at 27. Further, C.J.-W. expressed a desire to be adopted by that resource parent several times. *See id.* at 7-9. Caseworker Saint Jean testified that C.J.-W. is safe with all needs met in the resource home. *See id.* at 7. Also, C.J.-W.'s resource parent is teaching C.J.-W. about personal finance and credit and is helping C.J.-W. get a job and a car. *See id.* at 26-27. Moreover, C.J.-W. and the resource parent discuss topics such as how to conduct oneself and love. *See id.* at 27. Additionally, C.J.-W. has consistently attended school and is very close with the foster siblings in the home. *See id.*

As to T.J.-W. and I.J.-W., they were placed together in a different kinship resource family than C.J.-W. In their kinship placement together, T.J.-W. and I.J.-W. participated, on and off again, in individual therapy. *See id.* at 49. Caseworker Saint Jean testified that, once a month, each of T.J.-W.

_____

[11] In June 2025, Father admitted to Caseworker Saint Jean that he wanted to move away from the home because he felt "forced to sell drugs out of that home," people were arriving at the home unannounced, and that is where Father's "addiction lied." N.T. Termination Hearing, 7/17/25, at 15.

and I.J.-W. were offered to participate in family therapy with Father, but they each declined.[12]  *See id.* at 41-42, 45.  Further, T.J.-W. appeared angry to Caseworker Saint Jean when discussing having a relationship with Father; nevertheless, T.J.-W. only admitted to feeling indifferent toward Father.  *See id.* at 43.  T.J.-W. expressed to Caseworker Saint Jean that she was "living her best life" with the kinship family, including I.J.-W. and a kinship sibling, who are all very close.  *See id.* at 44.  I.J.-W. stated a desire to discontinue all contact with Father after one specific visit that I.J.-W. described as awkward and where I.J-W. had "nothing to say" to Father.  *Id.* at 45. Caseworker Saint Jean also testified that Father shared no bond with either of T.J.-W. or I.J.-W and that Father does not provide for them.  *See id.* at 47. Moreover, Caseworker Saint Jean noted that, in their kinship placement, T.J.-W. and I.J.-W. are well groomed and have progressed "tremendously." *Id.* at 44.

On June 26, 2025, DHS filed petitions to terminate Father's parental rights to Children.  The court appointed Linda Walters, Esquire, as Children's guardian *ad litem* and Neal Masciantonio, Esquire, as Children's counsel,

_____

[12] I.J.-W. initially expressed an interest in participating in family therapy with Father before Caseworker Saint Jean explained what family therapy was, at which point I.J.-W. no longer had interest in engaging in family therapy with Father.  *See* N.T. Termination Hearing, 7/17/25, at 46.

respectively.[13] On July 17, 2025, the court held a termination hearing, and that same day, it entered decrees involuntarily terminating Father's parental rights to Children, pursuant to Subsections 2511(a)(1), (2), (5), (8), and Section 2511(b) of the Adoption Act. **See** 23 Pa.C.S. § 2511. Father filed timely notices of appeal and contemporaneous Pennsylvania Rule of Appellate Procedure 1925(b) concise statements of errors complained of on appeal on August 15, 2025.[14] **See** Pa.R.A.P. 1925(a)(2).

On appeal, Father presents the following issue for our consideration: "Did the trial court abuse its discretion by granting DHS's petition to involuntarily terminate Father's parental rights under 23 Pa.C.S. § 2511(b), where DHS failed to prove by clear and convincing evidence that termination of Father's parental rights would best serve Child[ren]'s needs and welfare[?]" Appellant's Brief, at 2.

In his lone issue on appeal, Father does not raise a challenge to the grounds for termination of his parental rights under 23 Pa.C.S. § 2511(a);

---

[13] **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings); **see also In re K.R.**, 200 A.3d 969, 984 (Pa. Super. 2018) (*en banc*) (same); **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

[14] In its Rule 1925(a) opinion, the court of common pleas directs this Court's attention to its statements of reasons for its decision that it placed on the record at the termination hearing. **See** Pa.R.A.P. 1925(a) Opinion, 9/15/25, at 2 (unpaginated).

thus, under these circumstances, we rely on the well-reasoned trial court decision, pursuant to the relevant Section 2511(a) analysis, as set forth in the termination hearing transcript, *see* N.T. Termination Hearing, 7/17/25, at 88-93; *see also* Pa.R.A.P 1925(a) Opinion, 9/15/25, at 3 (unpaginated). Therefore, we turn our attention to Father's arguments regarding Children's best interests under Section 2511(b).

Specifically, Father notes that, in conducting the Section 2511(b) best interests analysis, the court must consider, *inter alia*, whether termination would destroy a necessary and beneficial bond between parent and child. Father complains that there was insufficient evidence to determine that there was not a necessary and beneficial bond between Children and Father, especially where there was insufficient evidence the relationships between Father and Children could not be repaired. Father largely bases his claim on the fact that family therapy was never implemented during the life of the case, despite Father's consistent and repeated requests for family therapy. Also, Father takes issue with the fact that T.J.-W.'s and I.J.-W.'s individual therapists were never consulted regarding the appropriateness of family therapy, especially where the court ordered such consultation on May 5, 2025. Father identifies the dual deaths of Mother in 2016 and Children's maternal grandmother in 2023 as sources of grief, loss, suffering, and trauma for the family, and as reasons why Children have expressed anger and indifference toward Father. Further, Father argues that it was insufficient for TCS to determine on its own that family therapy was inappropriate, without making

- 8 -

any effort to speak with Children's therapists. Moreover, Father points to the facts that, although Children currently do not want visits with him, he previously had unsupervised liberal visitation with C.J.-W., and there was no testimony that Children fear him. Father concludes that Children's anger with Father and indifference toward him are not sufficient to demonstrate it is in their best interests to have Father's parental rights terminated. Father posits that, if something came between him and Children, family therapy could provide a safe space for the family to communicate and work through their differences. We disagree that Father is entitled to relief.

Our Supreme Court has set forth the well-settled standard of review in termination of parental rights cases as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, quotation marks, and brackets omitted). It is also well-settled that termination of parental rights requires clear and convincing evidence, based on the totality of the circumstances, which is evaluated on a case-by-case basis:

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citations and quotation marks omitted).

Further, our Supreme Court has previously explained that appellate courts grant deference to trial courts regarding findings of fact and credibility determinations in termination proceedings:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a two-step analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for

- 10 -

termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1215 (Pa. Super. 2015) (citation omitted).

As Section 2511(a) is not at issue in this appeal, under the Section 2511(b) analysis,[15] the court evaluates:

the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In the Int. of A.R.*, 311 A.3d 1105, 1111 (Pa. Super. 2023) (citation omitted). In doing so, the court considers "intangibles such as love, comfort, security, and stability." *In re T.A.C.*, 110 A.3d 1028, 1033 (Pa. Super. 2015)

_____

[15] Section 2511(b) provides:

(b) Other considerations. - The court in terminating the rights of a parent shall give primary consideration to the development, physical and emotional needs, and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa.C.S.A. §2511(b).

- 11 -

(citation, quotations marks, and brackets omitted). The court should also consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child. *See A.R.*, 311 A.3d at 1114. In this regard, the court must evaluate "whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

Instantly, the trial court found that there was no parent-child bond between Father and any of the Children. *See* N.T. Termination Hearing, 7/17/25, at 93-94; *see also* Pa.R.A.P 1925(a) Opinion, 9/15/25, at 3 (unpaginated). The court observed that, although Children are aware of Father's identity, they do not look to him to meet their parental needs and instead look to their current caregivers to fill that role. *See* N.T. Termination Hearing, 7/17/25, at 94. Further, the court found that none of Children would suffer any irreparable harm if Father's rights were terminated because Children, consistently, did not want any relationship with Father. *See id.*

After our review, we conclude that the evidence was sufficient to establish that there was no parent-child bond between Father and Children and that termination of Father's parental rights to Children was in each of C.J.-W.'s, T.J.-W.'s, and I.J.-W.'s best interests, respectively. *See A.R.*, 311 A.3d

at 1111; *see also T.A.C.*, 110 A.3d at 1033; *Z.P.*, 994 A.2d at 1121. Caseworker Saint Jean, who was assigned to the case from November 2023, testified that none of Children share a bond with Father. *See* N.T. Termination Hearing, 7/17/25, at 26, 46-47. Also, C.J.-W. and I.J.-W. both expressed their clear desire to discontinue all future visits with Father. *See id.* at 22-24, 45. Although T.J.-W. expressed only an indifference toward Father, she stated that she is "living her best life" with the resource family. *Id.* at 44. Each of the Children are well cared-for in their respective placements and are well-bonded with the members of those families. *See id.* at 7, 27, 44. Indeed, contrary to Father's claims, Caseworker Saint Jean's testimony was sufficient evidence in the record from which the court could conclude by clear and convincing evidence that it was in each of the Children's best interests to terminate Father's parental rights. *See Z.P.*, 994 A.2d at 1121. Similarly, as no formal bonding evaluation is required, it was not necessary for TCS or DHS to seek input on the issue of family therapy from the Children's individual therapists prior to finding there was no bond between Children and Father, and Father cites no legal authority for this specific claim. *See id.* To the extent that Father argues that the court ordered for those therapists to be consulted on the issue of family therapy and they were not, we observe that Caseworker Saint Jean testified that those therapists did not respond to TPS's repeated communications on that issue. *See* N.T. Termination Hearing, 7/17/25, at 51-53. Under these circumstances, we discern no abuse of

discretion or error of law underlying the termination decrees at issue. *See*

*T.S.M.*, 71 A.3d at 267.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/12/2025